No. 20-1092

# In the United States Court of Appeals for the Fourth Circuit

NORTH CAROLINA STATE CONFERENCE OF THE NAACP, CHAPEL HILL–CARRBORO NAACP, GREENSBORO NAACP, HIGH POINT NAACP, MOORE COUNTY NAACP, STOKES COUNTY BRANCH OF THE NAACP, WINSTON SALEM–FORSYTH COUNTY NAACP,

*Plaintiffs-Appellees,*

*v.*

KEN RAYMOND, in his official capacity as a member of the North Carolina State Board of Elections; STELLA E. ANDERSON, in her official capacity as Secretary of the North Carolina State Board of Elections; DAMON CIRCOSTA, in his official capacity as Chair of the North Carolina State Board of Elections; JEFFERSON CARMON III, in his official capacity as a member of the North Carolina State Board of Elections; DAVID C. BLACK, in his official capacity as a member of the North Carolina State Board of Elections

*Defendants-Appellants,*

&

PHILIP E. BERGER, in his official capacity as President Pro Tempore of the North Carolina Senate, and TIMOTHY K. MOORE, in his official capacity as Speaker of the North Carolina House of Representatives,

*Intervenors,*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

**PETITION FOR EN BANC REVIEW**

(counsel listed on following page)

Irving Joyner
P.O. Box 374
Cary, NC 27512
(919) 319-8353
ijoyner@nccu.edu

Penda D. Hair
FORWARD JUSTICE
P.O. Box 42521
Washington D.C. 20015
(202) 256-1976
phair@forwardjustice.org

Caitlin A. Swain
FORWARD JUSTICE
400 W. Main St., Suite 203
Durham, NC 27701
(919) 323-3889
cswain@forwardjustice.org

Andrew T. Tutt
James W. Cooper
Jeremy C. Karpatkin
Stephen K. Wirth
Jacob Zionce
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
james.cooper@arnoldporter.com

John C. Ulin
ARNOLD & PORTER
  KAYE SCHOLER LLP
777 S. Figueroa St., 44th Floor
Los Angeles, CA 90017-5844
(213) 243-4228
john.ulin@arnoldporter.com

Counsel for Plaintiffs-Appellees North Carolina State Conference of the
NAACP, Chapel Hill–Carrboro NAACP, Greensboro NAACP, High Point
NAACP, Moore County NAACP, Stokes County Branch of the NAACP,
Winston Salem–Forsyth County NAACP

# RULE 35(b) STATEMENT

Plaintiffs-Appellees respectfully request that the full court consolidate this appeal with Appeal No. 19-2273 to determine (1) whether the North Carolina General Assembly may intervene in this case; and (2) whether the district court correctly granted a preliminary injunction against the enforcement of S.B. 824, a North Carolina election law impermissibly motivated, at least in part, by racially discriminatory intent.

The Court should hear this consolidated appeal *en banc* because it presents two questions of national importance. *First*, the question of whether members of a state legislature have Article III standing to seize control of the defense of the constitutionality of a law from the executive is one the Supreme Court has never answered, and it affects the separation of powers of every state, and between Congress and the President. *Second*, S.B. 824 would irreparably harm hundreds of thousands of voters in the upcoming November 2020 presidential election. Courts nationwide have held that similar voting rights challenges to photo voter ID requirements warrant *en banc* review. *See Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (*en banc*); and *Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012) (*en banc*); *see also Frank v. Walker*, 769 F.3d 494 (7th Cir. 2014) (reh'g *en banc* denied on 5-5 vote).

# TABLE OF CONTENTS

Page

RULE 35(b) STATEMENT ............................................................. 1

PETITION FOR REHEARING EN BANC ....................................... 1

FACTUAL BACKGROUND ............................................................ 4

    A.    North Carolina's Discriminatory Election Law (S.B. 824) ............ 4

    B.    The Decision Below Entering a Preliminary Injunction ............... 5

    C.    The Litigation Over the Motion to Intervene ................................. 9

ARGUMENT ................................................................................ 12

I.    The North Carolina Legislature Cannot Intervene in This Lawsuit Because It Lacks Article III Standing to Do So ...................... 12

    A.    Intervenors Must Have Standing to Intervene in a Lawsuit ...... 12

    B.    The General Assembly Clearly Lacks Article III Standing Because This Lawsuit Will Cause It No Cognizable "Injury" ............................................................................. 13

II.    The District Court Correctly Preliminarily Enjoined S.B. 824 Because It Was Impermissibly Motivated by Discriminatory Intent ........................................................................................ 17

CONCLUSION ............................................................................. 18

CERTIFICATE OF SERVICE ....................................................... 19

CERTIFICATE OF COMPLIANCE ............................................... 20

ADDENDUM A: Order Granting Intervention, No. 20-1092 (4th Cir.), Dkt. 43

ADDENDUM B: Memorandum Opinion, Order, and Preliminary Injunction, *N.C. State Conference of NAACP v. Cooper*, No. 1:18-cv-1034, 2019 WL 7372980 (M.D.N.C. Dec. 31, 2019)

# TABLE OF AUTHORITIES

**Cases** Page(s)

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
135 S. Ct. 2652 (2015) ...................................................................... 14

*Bond v. Utreras*,
585 F.3d 1061 (7th Cir. 2009) .......................................................... 12

*California v. Azar*,
950 F.3d 1067 (9th Cir. 2020) ............................................................ 1

*City of Chi. v. FEMA*,
660 F.3d 980 (7th Cir. 2011) ............................................................ 12

*Coleman v. Miller*,
307 U.S. 433 (1939) .......................................................................... 14

*Flying J, Inc. v. Van Hollen*,
578 F.3d 569, 571 (7th Cir. 2009) .................................................... 12

*Fairchild v. Hughes*,
258 U.S. 126(1922)............................................................................ 14

*Frank v. Walker*,
769 F.3d 494 (7th Cir. 2014) .............................................................. i

*Fund For Animals, Inc. v. Norton*,
322 F.3d 728 (D.C. Cir. 2003)..................................................... 12, 13

*Garza v. Hargan*,
874 F.3d 735, 736 (D.C. Cir. 2017)................................................... 1

*Gilliam v. Foster*,
61 F.3d 1070, 1073 (4th Cir. 1995)................................................... 1

*Gonzalez v. Arizona*,
677 F.3d 383 (9th Cir. 2012) .............................................................. i

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......................................................................... 14

*North Carolina ex rel. McCrory v. Berger*,
    781 S.E.2d 248, 256-58 (N.C. 2016) ................................................... 15

*N.C. State Conference of NAACP v. Cooper*,
    No. 1:18-cv-1034, 2019 WL 7372980 (M.D.N.C. Dec. 31, 2019).............. 4, 5, 6

*N.C. State Conference of the NAACP* v. *McCrory*,
    831 F.3d 204 (4th Cir. 2016) ........................................................ 4, 5

*Raines v. Byrd*,
    521 U.S. 811 (1997) ......................................................................... 15

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
    140 S. Ct. 1205 (2020) ....................................................................... 3

*Richmond Cty. Bd. of Educ. v. Cowell*,
    803 S.E.2d 27, 30 (N.C. App. 2017) ................................................. 15

*Safe Streets All. v. Hickenlooper*,
    859 F.3d 865, 912 (10th Cir. 2017) ................................................. 12

*South Dakota v. Ubbelohde*,
    330 F.3d 1014 (8th Cir. 2003) .......................................................... 12

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) .................................................................... 15

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ........................................................................... 14

*Town of Chester v. Laroe Estates*,
    137 S. Ct. 1645 (2017) .................................................................... 12

*United States v. Metro. St. Louis Sewer Dist.*,
    569 F.3d 829 (8th Cir. 2009) .......................................................... 12

*United States ex rel. Eisenstein v. City of New York*,
    556 U.S. 928 (2009) ......................................................................... 13

*United States v. Richardson*,
    418 U.S. 166 (1974) ......................................................................... 14

*Veasey v. Abbott,*
   830 F.3d 216 (5th Cir. 2016) ....................................................................i

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens,*
   529 U.S. 765 (2000) ................................................................................16

*Village of Arlington Heights v. Metropolitan Housing Development
   Corp.,*
   429 U.S. 252, 264-66 (1977)......................................................................5

*Virginia House of Delegates v. Bethune-Hill,*
   139 S. Ct. 1945 (2019) ......................................................................14, 16

**Federal Laws and Rules**

U.S. Const. art. III, § 2, cl. 1 ..................................i, 2, 12, 13, 14, 15, 16

28 U.S.C. § 46(c) ............................................................................................1

Fed. R. App. P. 35(a) ....................................................................................1

**North Carolina Laws**

N.C. Gen. Stat. § 1-72.2..............................................................................15

N.C. Gen. Stat. § 114-2(10) ........................................................................15

N.C. Gen. Stat. § 120-32.6..........................................................................15

Senate Bill 824
   SL 2018-144, N.C. Gen. Assembly (2017-2018 Sess.),
   http://archive.is/KPzGR..................................................................*passim*

House Bill 589
   SL 2013-381, N.C. Gen. Assembly (2013-2014 Sess.),
   http://archive.is/uSVr6..................................................................4, 5, 17

## PETITION FOR REHEARING EN BANC

Without opinion, a divided panel granted intervention to legislative leaders of the North Carolina General Assembly ("the General Assembly") in this appeal. The panel thereby decided—by summary order—the single most extensively litigated issue in this case. By granting intervention without explanation, the panel may have effectively nullified a materially indistinguishable earlier-filed and separately pending appeal (Appeal No. 19-2273 or "the Intervention Appeal") concerning denial of the General Assembly's motion to intervene in the district court. Plaintiffs-Appellees respectfully request that the Court take this appeal *en banc*, consolidate this appeal with the Intervention Appeal, and reverse the panel's decision.

This case should be heard *en banc* in light of its exceptional national importance. Rehearing by the *en banc* court is authorized by rule and statute. *See* Fed. R. App. P. 35(a) (providing that a case may be "heard or reheard by the court of appeals *en banc*"); 28 U.S.C. § 46(c) (similar); *see also Gilliam v. Foster*, 61 F.3d 1070, 1073 (4th Cir. 1995) (*en banc*) (reviewing denial of interim relief); *Garza v. Hargan*, 874 F.3d 735, 736 (D.C. Cir. 2017) (*en banc*) (same); *California v. Azar*, 950 F.3d 1067 (9th Cir. 2020) (*en banc*) (reviewing grant of interim relief).

There can be little doubt that the issues presented by this case meet the standard for *en banc* consideration. This case raises an exceptional issue of pressing concern to the people of North Carolina whose voting rights S.B. 824 violates, and to the orderly administration of the 2020 election in the state of North Carolina. This case is also exceptionally important because of its implications for an important-but-undecided question of constitutional law, namely, whether a legislature has an Article III injury whenever the constitutionality of a law it enacted is challenged even if the legislature's participation in a case would invade the executive's exclusive constitutional authority to take care that the laws are faithfully executed.

Although the Defendants-Appellants view the issues in this case from a different perspective, they too find the questions presented exceptionally important. The Executive Branch Defendants' have vigorously defended S.B. 824 at every stage of this proceeding. And Defendants agree with Plaintiffs-Appellees that permitting the North Carolina General Assembly to intervene in this lawsuit as of right "would violate the North Carolina constitution's express guarantee of separation of powers." No. 19-2273, Dkt. 41, at 11, 16-19.

The Intervenors-Appellants also see the issues in this case as exceptionally important. They have moved to intervene in this case three times—twice

in the district court, and once directly in this appeal. Intervenors have filed two appeals and sought a writ of mandamus relating to the denial of intervention (one of which this Court is currently considering, Appeal No. 19-2273). And though not parties, Intervenors filed two motions to stay the district court proceedings—one in the district court and one in this Court. Intervenors have maintained that "it is imperative that the merits of this appeal be heard expeditiously." Dkt. 48, at 8. And not satisfied with *amicus* status—to which Plaintiffs-Appellees have always consented—Intervenors view it as exceptionally important that they be "parties in this appeal … entitled to file briefs … share oral argument time, and petition for rehearing or certiorari if this Court rules against Defendants." *Id.* at 5.

Hearing this appeal *en banc* is thus consistent with all parties' views of the significance of the case. Moreover, consolidation and *en banc* review will promote a swifter resolution of these appeals, which is in the interest of all parties and in the public interest. *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (reemphasizing "that lower federal courts should ordinarily not alter the election rules on the eve of an election"). Plaintiffs-Appellees therefore respectfully request that the Court take the

case *en banc* to review the panel's divided intervention decision and determine the merits of the two appeals.

## FACTUAL BACKGROUND

### A.    North Carolina's Discriminatory Election Law (S.B. 824)

In *N.C. State Conference of the NAACP v. McCrory*, 831 F.3d 204, 214 (4th Cir. 2016), this Court struck down H.B. 589, a North Carolina election law that, among other things, imposed a photo voter-ID requirement. The Court held that the law *intentionally discriminated* against African-Americans, calling it "the most restrictive voting law North Carolina has seen since the era of Jim Crow," that "target[ed] African Americans" for voter suppression "with almost surgical precision." *Id.* at 229, 214.

North Carolina enacted the election law at issue in this case—Senate Bill 824 (S.B. 824)—shortly thereafter. S.B. 824, like its predecessor, H.B. 589, requires photo voter ID and vastly increases the number of people who can challenge ballots. S.B. 824 carries the same impermissible discriminatory intent as the law this Court struck down in *McCrory*, and fails to remedy its racially disparate impacts. Like H.B. 589 before it, S.B. 824 purports to address a problem (impersonation voter fraud) that does not exist in North Carolina. *McCrory*, 831 F.3d at 214; *N.C. State Conference of NAACP v. Cooper*,

No. 1:18-cv-1034, 2019 WL 7372980, at *18-19 (M.D.N.C. Dec. 31, 2019). Like H.B. 589 before it, the General Assembly continued to possess detailed racial data that allowed it to construct a list of permissible voter IDs that would disproportionately impact Black voters. *McCrory*, 831 F.3d at 216; *Cooper*, 2019 WL 7372980, at *10. Like H.B. 589, S.B. 824 inexplicably excludes public-assistance and federal employee photo IDs, even though those forms of ID are highly reliable and disproportionately possessed by African-American voters. *McCrory*, 831 F.3d at 227; *Cooper*, 2019 WL 7372980, at *10, *14, *19. Like its predecessor H.B. 589, the General Assembly enacted S.B. 824 to burden minority voters. *Cooper*, 2019 WL 7372980, at *23.

**B.    The Decision Below Entering a Preliminary Injunction**

On December 31, 2019, the court below entered a preliminary injunction, barring the State of North Carolina from enforcing the photo-ID requirement pending a trial in this matter, finding that Plaintiffs were likely to prove that the General Assembly enacted S.B. 824 with discriminatory intent. *Cooper*, 2019 WL 7372980.

Applying the test from *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 264-66 (1977), the district court

concluded that the law was likely "impermissibly motivated, at least in part, by discriminatory intent."  2019 WL 7372980, at *26.

*First*, the court held that the longstanding history of voter suppression in North Carolina, as well as the more recent history of voter suppression through strategies like racial gerrymandering and the enactment of a racially discriminatory election law very similar to S.B. 824 demonstrate that "the legislature has continued to violate both the VRA and the Constitution."  The Court also found that, as with *McCrory,* "racially polarized voting between African Americans and whites remains prevalent in North Carolina."  The court found both "a past and current practice of and incentive to limit certain groups' access to the franchise."  *Id.* at *2-4, *6-7.

*Second*, the court held that the "unusual" circumstances surrounding S.B. 824's enactment provided further evidence that the General Assembly enacted S.B. 824 with discriminatory intent.  *Id.* at *7-9.  The court found that "many of the same legislative leaders who championed HB589 … were instrumental in enacting SB824," a consideration that was "particularly striking in light of Defendants' admission that there were no 'changes in legislative policy preferences leading to the enactment of SB824.'"  *Id.* at *17.  Moreover, the court recognized that "the legislature's status as the product of

6

unconstitutional mapmaking must be considered as an integral part of S.B. 824's origins," where S.B. 824 was passed "in the waning days of the lame-duck 2018 legislative term," just before a new legislature was seated. *Covington v. North Carolina*, 267 F. Supp. 3d 664, 668 (M.D.N.C. 2017).

*Third*, the court held that the legislative history of S.B. 824 "supports a finding that the enactment of S.B. 824, like its predecessor, was imbued with discriminatory intent." *Id.* at *9-10. In particular, the court examined statements of legislative proponents of S.B. 824 and found that S.B. 824's champions developed a strategy surrounding S.B. 824 to circumvent the holding of *McCrory*; that is, "to evade precedent, rather than abide by it." The court also found evidence of discriminatory intent by the legislature's choice to reject an amendment allowing the use of public assistance IDs for voting, a form of identification known to legislators to be disproportionately used by African American voters. The *McCrory* decision specifically focused on the exclusion of public assistance IDs as indicia of discriminatory intent, and the court found the exclusion of public assistance IDs, "despite the attention given to it in *McCrory*" to be "particularly suspect."

*Fourth*, after engaging in "an independent analysis of S.B. 824's likely [disparate] effect," the court held that "Plaintiffs are likely to succeed in

showing that S.B. 824 will 'bear more heavily on one race than another' in two distinct ways'"—by both (1) disparately *denying* minority voters the right to vote directly, and (2) disparately *deterring* minority voters from voting. *Id.* at *11-17. The court examined the forms of identification allowed under S.B. 824, which voters are likely to possess these forms of identification, and the likely impact of the ameliorative measures in S.B. 824, and concluded that "the evidence suggests that S.B. 824 is likely to have a racially disproportionate impact in North Carolina by preventing some voters of color from casting their ballots when they get to the polls." The court also found that a larger number of voters, disproportionately African American, "could be deterred from voting or registering to vote because they lack, or believe they lack, acceptable identification and remain confused by or uninformed about S.B. 824's exceptions."

*Finally*, the court analyzed each non-racial motivation proffered by the state and concluded that "Defendants have failed at this stage to demonstrate that S.B. 824 'would have been enacted without' race as a motivating factor." *Id.* *46.[1]

---

[1] The Court held that Plaintiffs had not marshalled sufficient evidence "at this stage" to show that S.B. 824 likely violated the Voting Rights Act based on its disparate results on minority voters. *Id.* at *24. Likewise the court declined to grant injunctive relief as to the provisions of the law increasing the number of at-large poll observers. *Id.* at *46.

### C.    The Litigation Over the Motion to Intervene

Apart from the important merits claims, this case has from its outset involved a collateral effort by the North Carolina General Assembly over whether it should be permitted to intervene. The Intervenors have made so many filings, and taken so many appeals, that litigation over the question of intervention has threatened to overwhelm the merits case (precisely the threat that led the district court to *twice* deny permissive intervention in this case).

Plaintiffs sued the North Carolina Governor and members of the State Board of Elections in the Middle District of North Carolina in December 2018. D. Ct. Dkt. 1. The Intervenors moved to intervene in January 2019. D. Ct. Dkt. 7. And the district court issued a written decision denying the motion in June 2019. D. Ct. Dkt. 56. The intervenors did not appeal that decision. Instead, Intervenors refiled a materially indistinguishable "renewed" motion to intervene six weeks later, in July 2019. D. Ct. Dkt. 60. Less than two months later, in September 2019, the Intervenors demanded a ruling on their renewed motion from the district court. D. Ct. Dkt. 71. Less than a week later, and before the district court could rule, Intervenors appealed the district court's "constructive denial" of their motion and simultaneously petitioned this Court for a writ of mandamus. Nos.19-2048, 19-2056. Intervenors filed a

motion to expedite the appeal, and two motions to stay the district court pro-
ceedings—one in the district court, D. Ct. Dkt. 75, and one in the mandamus
action, No. 19-2056, Dkt. 11.  This Court dismissed the appeal and denied the
petition in October.  No. 19-2048, Dkt. 50; No. 19-2056, Dkt. 37.

About a month later, in November 2019, the district court denied the
Intervenor's renewed motion to intervene.  Intervenors' appeal from the de-
nial of their renewed request to intervene is pending as Appeal  No. 19-2273.
It is that appeal that Plaintiffs-Appellees respectfully request the Court con-
solidate with this one.

On December 31, 2019, the district court granted Plaintiffs' motion for a
preliminary injunction and enjoined enforcement of S.B. 824. D. Ct. Dkt. 120.
The State Board then filed this appeal, but did not seek an emergency stay of
the preliminary injunction because the injunction was entered too close to the
upcoming March primaries.  D. Ct. Dkt. 127.  Nonetheless, even though they
were not parties or intervenors to this case, Intervenors moved in the district
court to stay the preliminary injunction pending the resolution of their appeal
of the denial of their motion to intervene. D. Ct. Dkt. 121.  Plaintiffs and the
State Board Defendants filed briefs in opposition.  D. Ct. Dkt. 127, 128.

Then, in early February 2020—even though Intervenors had a pending appeal of the denial of their motion to intervene in the district court already before this Court (Appeal No. 19-2273)—Intervenors moved to intervene directly in this merits appeal. Dkt. 4. That motion relied on the exact same facts and arguments Intervenors had twice before relied on in the district court and had already presented in their opening brief in their intervention appeal. Plaintiffs-Appellees opposed the motion on the merits, but also on the grounds that—because Intervenors had already tried and failed to win Intervention so many times in this very case—granting the motion would violate basic principles of issue preclusion, claim preclusion, law of the case, and the first-filed rule. Dkt. 31. The divided panel granted the motion to intervene without opinion. Dkt. 43. Judge Harris voted to deny the motion.

In light of the gravity of the panel's decision, Plaintiffs-Appellee's immediately moved for reconsideration or clarification of the basis for the decision. Dkt. 45. The panel denied the motion for reconsideration. Dkt. 49. This petition for rehearing *en banc* followed.

## ARGUMENT

**I.    The North Carolina Legislature Cannot Intervene in This Lawsuit Because It Lacks Article III Standing to Do So**

### A.    Intervenors Must Have Standing to Intervene in a Lawsuit

Intervenors lack Article III standing to intervene.  "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Town of Chester v. Laroe Estates*, 137 S. Ct. 1645, 1650 (2017) (citation omitted). This Circuit has yet to decide whether intervenors independently need standing, but the better view—shared by several circuits—is that to intervene in a federal lawsuit, a party must have Article III standing.  *See Fund For Animals, Inc. v. Norton*, 322 F.3d 728, 731-32 (D.C. Cir. 2003); *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 912 (10th Cir. 2017); *Flying J, Inc. v. Van Hollen*, 578 F.3d 569, 571 (7th Cir. 2009); *South Dakota v. Ubbelohde*, 330 F.3d 1014, 1023 (8th Cir. 2003).

In the Seventh Circuit, "standing is necessarily a component of intervention as of right under Rule 24(a)." *Bond v. Utreras,* 585 F.3d 1061, 1069-70 (7th Cir. 2009); *see, e.g., City of Chi. v. FEMA,* 660 F.3d 980, 984-985 (7th Cir. 2011) (similar).  The Eighth Circuit likewise holds that "a party seeking to intervene must establish Article III standing in addition to the requirements of Rule 24." *United States v. Metro. St. Louis Sewer Dist.,* 569 F.3d 829, 833

(8th Cir. 2009).  The D.C. Circuit has the same rule. "[I]n addition to establishing its qualification for intervention under Rule 24(a)(2), a party seeking to intervene as of right must demonstrate that it has standing under Article III of the Constitution." *Fund for Animals*, 322 F.3d at 731-732.

This Court should join those circuits.  The rule follows directly from Article III's requirement that federal courts exercise the judicial power only at the behest of persons who will be concretely affected by the court's decision. As Intervenors note, an intervenor becomes a "party" to a lawsuit once admitted to an action. *See United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 933-34 (2009).  Intervenors contend that means they are "entitled to file briefs … share oral argument time, and petition for rehearing or certiorari if this Court rules against Defendants."  Dkt. 48, at 5.  And they will undoubtedly seek to put on their own witnesses and experts at trial, as they already attempted at the preliminary-injunction stage.  D. Ct. Dkts. 96, 116.

### B.    The General Assembly Clearly Lacks Article III Standing Because This Lawsuit Will Cause It No Cognizable "Injury"

The General Assembly lacks Article III standing because invalidation of S.B. 824 will not cause the General Assembly any cognizable "injury." "Concrete and particularized" injury is an essential requirement of Article III

13

standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  None of the General Assembly's alleged injuries confer standing.

The General Assembly's desire to defend laws it has enacted is not an Article III interest.  *See Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1953 (2019) ("judicial decision invalidating a state law as unconstitutional" does not inflict "a discrete, cognizable injury" on the legislature).  Indeed, an alleged "right to have the Government act in accordance with law" is not an Article III injury. *Lujan*, 504 U.S. at 575; *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 106-07 (1998); *Fairchild v. Hughes*, 258 U.S. 126, 129 (1922) (similar). This type of injury results in an "impact on [the party] … plainly undifferentiated and common to all members of the public." *United States v. Richardson*, 418 U.S. 166, 176-77 (1974).

Enjoining or invalidating S.B. 824 would not have any unique impact on the General Assembly's legislative powers that might give rise to a concrete and particularized injury for purposes of establishing legislative standing. *Compare Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2665 (2015) (recognizing state legislature's standing for losing power to enact redistricting maps); *Coleman v. Miller*, 307 U.S. 433, 436 (1939) (recognizing state senators' standing for losing ability to ratify or deny

constitutional amendments), *with Raines v. Byrd*, 521 U.S. 811, 828-30 (1997) (alleged "burden" on legislative power is not an Article III injury). This case does not affect Proposed Intervenors' legislative powers.

Nor does the General Assembly have a right to represent North Carolina as its agent, for three reasons. *First*, North Carolina law does not confer any such right on the General Assembly. *See* N.C. Gen. Stat. § 1-72.2 (not conferring such a right); *id.* § 114-2(10) (same); *id.* § 120-32.6 (same). *Second*, if North Carolina statutory law *did* purport to confer such a right, it would violate North Carolina's separation of powers because the responsibility to "take care" that the laws are faithfully executed, including the decision of how to defend the constitutionality of legislation, is a uniquely executive function under the North Carolina Constitution. N.C. Const. art. III, §§ 1, 5(4); *See North Carolina ex rel. McCrory v. Berger*, 781 S.E.2d 248, 256-58 (N.C. 2016); *see also Richmond Cty. Bd. of Educ. v. Cowell*, 803 S.E.2d 27, 30 (N.C. App. 2017), *review denied*, 809 S.E.2d 872 (N.C. 2018). Third, a state statute cannot create Article III standing out of thin air merely through declaring that the legislature is injured any time a North Carolina law is challenged. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016) ("Article III standing requires a

concrete injury even in the context of a statutory violation."); *see also Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000).

Intervenors' reliance on *Bethune-Hill*, 139 S. Ct. 1945, for the proposition that the General Assembly may intervene in this case on behalf of the State as a whole is misplaced. *Bethune Hill* said that if Virginia "had designated the House to represent its interests, and if the House had in fact carried out that mission, we would agree that the House could stand in for the State." *Id.* at 1951. But here, (1) North Carolina has not designated the General Assembly to defend its enactments; (2) a statute purporting to grant the General Assembly that authority would violate the North Carolina constitution; and (3) the sentence of *Bethune Hill* on which Intervenors rely does not address the situation in this case, where the executive branch of the same state is actively defending a state law, and the State legislature seeks to seize control of the lawsuit. *See* Appellee Brief, Appeal No. 19-2273, Dkt. 43, at 27-30; 31-33; 41-42.

Because the General Assembly will suffer no Article III injury if S.B. 824 is enjoined, and because the General Assembly is not the agent of the State as a whole in this lawsuit, Intervenors lack standing to intervene.

## II.     The District Court Correctly Preliminarily Enjoined S.B. 824 Because It Was Impermissibly Motivated by Discriminatory Intent

The district court correctly preliminarily enjoined S.B. 824. S.B. 824 carries the same discriminatory intent as H.B. 589, a North Carolina election law that this Court previously invalidated. Virtually the same legislative leadership enacted S.B. 824 during its final days, with authority derived from a widespread, unconstitutional racial gerrymander. Like H.B. 589 before it, S.B. 824's purpose is, at least in part, to suppress the participation of Black voters and an emerging Latino electorate in the state of North Carolina. S.B. 824 therefore violates section 2 of the Voting Rights Act and the United States Constitution. S.B. 824 fails to remedy H.B. 589's racially disparate impacts, and non-discriminatory rationales advanced in support of S.B. 824 were pretextual.

* * *

This case involves two issues of exceptional national importance. Whether a state legislature may seize control of a federal lawsuit from the executive branch representing the interest of the same state is a question of significant practical and legal importance. And whether a photo voter ID law impermissibly motivated by racially discriminatory intent should now go into effect in North Carolina could determine the voting rights of hundreds of

17

thousands of voters in the 2020 presidential election.  The stakes could not be higher.

## CONCLUSION

The Court should consolidate the appeals and grant *en banc* review.

May 1, 2020

Irving Joyner
P.O. Box 374
Cary, NC 27512
(919) 319-8353
ijoyner@nccu.edu

Caitlin A. Swain
FORWARD JUSTICE
400 W. Main St., Suite 203
Durham, NC 27701
(919) 323-3889
cswain@forwardjustice.org

Penda D. Hair
FORWARD JUSTICE
P.O. Box 42521
Washington D.C. 20015
(202) 256-1976
phair@forwardjustice.org

Respectfully submitted,

s/ *Andrew Tutt*
Andrew T. Tutt
James W. Cooper
Jeremy C. Karpatkin
Stephen K. Wirth
Jacob Zionce
ARNOLD & PORTER KAYE
SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
andrew.tutt@arnoldporter.com

John C. Ulin
ARNOLD & PORTER
KAYE SCHOLER LLP
777 S. Figueroa St., 44th Floor
Los Angeles, CA 90017
(213) 243-4000
john.ulin@arnoldporter.com

*Counsel for Plaintiffs-Appellees North Carolina State Conference of the NAACP, Chapel Hill–Carrboro NAACP, Greensboro NAACP, High Point NAACP, Moore County NAACP, Stokes County Branch of the NAACP, Winston Salem–Forsyth County NAACP*

18

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was filed electronically on May 1, 2020, and will, therefore, be served electronically upon all counsel.

s/ *Andrew Tutt*
Andrew T. Tutt

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 29(a)(4) and 32(g), I hereby certify that:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) because this brief contains 3,803 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 27(d)(1)(E) because this brief has been prepared using Microsoft Office Word and is set in Century Schoolbook font in a size equivalent to 14 points or larger.

s/ *Andrew Tutt*
Andrew T. Tutt

**ADDENDUM A**

Order Granting Intervention, No. 20-1092 (4th Cir.), Dkt. 43

FILED:  March 27, 2020

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 20-1092
(1:18-cv-01034-LCB-LPA)

_____

NORTH CAROLINA STATE CONFERENCE OF THE NAACP; CHAPEL
HILL-CARRBORO NAACP; GREENSBORO NAACP; HIGH POINT NAACP;
MOORE COUNTY NAACP; STOKES COUNTY BRANCH OF THE NAACP;
WINSTON SALEM-FORSYTH COUNTY NAACP

Plaintiffs - Appellees

v.

KEN RAYMOND, in his official capacity as a member of the North Carolina
State Board of Elections; STELLA ANDERSON, in her official capacity as
Secretary of the North Carolina State Board of Elections; DAMON CIRCOSTA,
in his official capacity as Chair of the North Carolina State Board of Elections;
JEFFERSON CARMON, in his official capacity as a member of the North
Carolina State Board of Elections; DAVID C. BLACK, in his official capacity as
a member of the North Carolina State Board of Elections

Defendants - Appellants

-------------------------------

PHILIP E. BERGER, in his official capacity as President Pro Tempore of the
North Carolina Senate; TIMOTHY K. MOORE, in his official capacity as
Speaker of the North Carolina House of Representatives

Amici Supporting Appellants/Intervenors

———————————————

O R D E R

———————————————

Upon consideration of submissions relative to the motion to intervene, the
court grants the motion.  The Clerk is directed to amend the caption accordingly.

Judge Richardson and Judge Quattlebaum voted to grant the motion.  Judge
Harris voted to deny the motion.

For the Court

/s/ Patricia S. Connor, Clerk

**ADDENDUM B**

Memorandum Opinion, Order, and Preliminary Injunction,
*N.C. State Conference of NAACP v. Cooper*,
No. 1:18-cv-1034, 2019 WL 7372980 (M.D.N.C. Dec. 31, 2019)

2019 WL 7372980
Only the Westlaw citation is currently available.
United States District Court, M.D. North Carolina.

NORTH CAROLINA STATE CONFERENCE OF the
NAACP, Chapel Hill—Carrboro NAACP, Greensboro
NAACP, High Point NAACP, Moore County
NAACP, Stokes County Branch of the NAACP,
Winston-Salem—Forsyth County NAACP, Plaintiffs,
v.
Roy Asberry COOPER III, in his official capacity as
the Governor of North Carolina; Robert Cordle, in
his official capacity as Chair of the North Carolina
State Board of Elections; Stella Anderson, in her
official capacity as Secretary of the North Carolina
State Board of Elections; Kenneth Raymond,
Jefferson Carmon III, and David C. Black, in
their official capacities as members of the North
Carolina State Board of Elections, Defendants.

1:18CV1034
|
Signed 12/31/2019

**Synopsis**
**Background:** Civil rights organizations brought action
against Governor of North Carolina and members of the
North Carolina State Board of Elections in their official
capacities, challenging the validity of law implementing
state constitutional amendment requiring photographic
identification to vote under the Voting Rights Act (VRA)
and the Fourteenth and Fifteenth Amendments, and seeking
declaratory and injunctive relief. Organizations moved for
preliminary injunction.

**Holdings:** The District Court, Loretta C. Biggs, J., held that:

organizations were likely to establish that race was a factor
motivating enactment of law;

state's argument that it passed law to combat voter fraud and
promote public confidence in the electoral system were likely
insufficient to demonstrate that law would have been enacted
without the motivating factor of racial discrimination;

state's argument that legislature was motivated by an interest
in fulfilling the mandate of the state constitution to pass a
voter identification law was likely insufficient to demonstrate
that law would have been enacted without the motivating
factor of racial discrimination;

state would likely not be able to establish that its interest in
withstanding judicial scrutiny demonstrated that law would
have been enacted without the motivating factor of racial
discrimination;

organizations did not demonstrate a likelihood of success
under the results standard of § 2 of the VRA sufficient to
independently warrant a preliminary injunction;

balance of equities favored a preliminary injunction; and

public interest favored a preliminary injunction.

Motion granted in part and denied in part.

**Procedural Posture(s):** Motion for Preliminary Injunction.

**West Codenotes**

**Recognized as Unconstitutional**
N.C. Const. art. 6, §§ 2(4), 3(2)

**Validity Called into Doubt**
N.C. Gen. Stat. Ann. §§ 163-87, 163-166.16, 163-230.2(a)
(4), (f)

**Attorneys and Law Firms**

Andrew T. Tutt, James W. Cooper, Jeremy C. Karpatkin, Ralf
O. Dunn, Arnold & Porter Kaye Scholer LLP, Caitlin Swain-
McSurely, Penda Denise Hair, Forward Justice, Washington,
DC, John C. Ulin, Arnold & Porter Kaye Scholer LLP,
Los Angeles, CA, Leah J. Kang, ACLU of North Carolina,
Raleigh, NC, Irving L. Joyner, Irving Joyner, Attorney at
Law, Cary, NC, for Plaintiffs.

Amar Majmundar, Olga E. Vysotskaya De Brito, Paul M.
Cox, Stephanie A. Brennan, N.C. Department of Justice,
Raleigh, NC, for Defendants.

**MEMORANDUM OPINION, ORDER,
AND PRELIMINARY INJUNCTION**

Loretta C. Biggs, United States District Judge

**\*1** Plaintiffs initiated this lawsuit for declaratory and injunctive relief against the above-named Defendants in their official capacities, challenging the validity of specific provisions of Senate Bill 824, titled "An Act to Implement the Constitutional Amendment Requiring Photographic Identification to Vote," ("S.B. 824" or "the Act"). (*See* ECF No. 1); 2018 N.C. Sess. Laws 144. Specifically, Plaintiffs allege that portions of S.B. 824 violate § 2 of the Voting Rights Act ("VRA"), 52 U.S.C. § 10301, as well as the Fourteenth and Fifteenth Amendments of the United States Constitution. (*Id.* ¶¶ 105–146.) Before the Court is Plaintiffs' Motion for a Preliminary Injunction. (ECF No. 72.) The Court heard oral argument on December 3, 2019. For the reasons outlined below, Plaintiffs' motion will be granted in part and denied in part.

## I. BACKGROUND

In November 2018, North Carolina voters approved a ballot measure amending the North Carolina State Constitution to require voters to provide photographic identification before voting in person (the "voter-ID amendment").[1] (ECF No. 1 ¶¶ 62, 64.) As the voter-ID amendment is not self-executing, *see* N.C. Const. art. VI, §§ 2(4), 3(2), on December 5, 2018, the North Carolina General Assembly (the "General Assembly" or the "legislature") passed S.B. 824 as implementing legislation.[2] (*See* ECF No. 1 ¶ 1.) The Governor vetoed S.B. 824 on December 14, 2018. (*Id.* ¶ 78.) Nevertheless, the General Assembly codified S.B. 824 into law—Session Law 2018-144—by an override of the Governor's veto on December 19, 2018. (*Id.* ¶ 1; 2018 N.C. Sess. Laws 144. S.B. 824's central requirement is that every voter present a qualifying photo ID before casting a ballot. 2018 N.C. Sess. Laws 144 § 1.2.(a).

The instant lawsuit was filed in this Court one day after S.B. 824 became law. (ECF No. 1 at 37.) In their Complaint, Plaintiffs challenge the provisions of S.B. 824 which "impose voter-identification requirements," as well as the provisions "that expand the number of poll observers and the number[ ] of people who can challenge ballots."[3] (*Id.* ¶¶ 106–07.) Plaintiffs allege that "[t]hese provisions, separately and together, will have a disproportionately negative impact on minority voters," (*id.* ¶ 80), ultimately resulting in "the effective denial of the franchise and dilution of [African American and Latino] voting strength," (*id.* ¶ 7). Plaintiffs'

Complaint further alleges that the challenged provisions "impose discriminatory and unlawful burdens on the right to vote that are not justified by any legitimate or compelling state interest." (*Id.* ¶ 8.) Plaintiffs seek this preliminary injunction to prevent Defendants "from implementing, enforcing, or giving effect to the [challenged] provisions of S.B. 824." (*Id.* ¶ 147.)

## II. PRELIMINARY INJUNCTION STANDARD

**\*2** A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). To make a sufficient showing, a plaintiff must establish: (1) a likelihood of success on the merits; (2) that irreparable harm will result in the absence of an injunction; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *Id.* at 20, 129 S.Ct. 365. Each factor is considered independently; even if a plaintiff has shown likelihood of success on the merits and irreparable harm, the balance of equities and the public interest can still weigh in favor of denying a preliminary injunction. *See id.* at 23–24, 31 n.5, 129 S.Ct. 365.

Whether to grant a preliminary injunction is within the sound discretion of the district court. *Westmoreland Coal Co., Inc. v. Int'l Union, United Mine Workers of Am.*, 910 F.2d 130, 135 (4th Cir. 1990). Traditionally, courts employ preliminary injunctions for the limited purpose of maintaining the status quo—the "last uncontested status between the parties which preceded the controversy"—and preventing irreparable harm during the course of litigation, thereby preserving the possibility of a meaningful judgment on the merits. *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013) (quoting *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012)); *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003). Because the issuance of a preliminary injunction "is a matter of equitable discretion[,] it does not follow from success on the merits as a matter of course." *Winter*, 555 U.S. at 32, 129 S.Ct. 365. Rather, "[i]n each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.' " *Id.* at 24, 129 S.Ct. 365 (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)).

Furthermore, the Supreme Court has instructed federal courts to "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.*

This carefulness is especially warranted in the voting-rights context, where court orders "can themselves result in voter confusion" and, where "once [an] election occurs, there can be no do-over and no redress." *See Purcell v. Gonzalez*, 549 U.S. 1, 4–5, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) [hereinafter "LWV"].

## III. HISTORY OF VOTER-ID LEGISLATION IN NORTH CAROLINA

In recent decisions, the Supreme Court and the Fourth Circuit have set forth the history of voter suppression efforts in the South generally and North Carolina specifically. *See Shelby Cty. v. Holder*, 570 U.S. 529, 552, 133 S.Ct. 2612, 186 L.Ed.2d 651 (2013); *North Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 223–24 (4th Cir. 2016). However, to fully understand and contextualize S.B. 824, its mechanics, its proposed implementation, and the motivations of those who enacted it, a brief review of that history is necessary here. No one disputes that North Carolina "has a long history of race discrimination generally and race-based vote suppression in particular." *McCrory*, 831 F.3d at 223. For "[i]t was in the South that slavery was upheld by law until uprooted by the Civil War, that the reign of Jim Crow denied African–Americans the most basic freedoms, and that state and local governments worked tirelessly to disenfranchise citizens on the basis of race." *Shelby Cty.*, 570 U.S. at 552, 133 S.Ct. 2612. North Carolina was no exception; as discussed further below, the state has "shameful" chapters—both distant and contemporary—in its "long and cyclical" history. *See McCrory*, 831 F.3d at 223; (ECF No. 91-2 at 71).

**\*3** In light of this history, Congress subjected forty North Carolina jurisdictions to "preclearance" under § 5 of the VRA. *McCrory*, 831 F.3d at 215. As a result, the state was not permitted to make changes to voting procedures or qualifications without first demonstrating that the changes "had neither the purpose nor effect of 'diminishing the ability of any citizens' to vote 'on account of race or color.' " *Id.* (quoting 52 U.S.C. § 10304 (formerly 42 U.S.C. § 1973c)). Decades of preclearance enabled steady growth in minority electoral participation, and "by 2013 African American registration and turnout rates had finally reached near-parity" with whites'. *See id.* at 214; (ECF No. 91-4 at 10 (acknowledging "the recent parity in black and white turnout" but characterizing it as "fragile" and sensitive to "new costs imposed on voters")).

The General Assembly first attempted to enact a voter-ID bill in 2011 while the state was still subject to preclearance. (ECF Nos. 91 at 13; 97 at 20.) The governor at the time vetoed that bill, and an override attempt failed. (ECF No. 97 at 20.) In the spring of 2013, the legislature again took up voter-ID legislation in the form of House Bill 589 ("H.B. 589"). *See McCrory*, 831 F.3d at 227. In its early form, the photo-ID requirements outlined in H.B. 589 were limited and, compared to later iterations, "much less restrictive." [4] *See id.* at 216, 227; (ECF No. 91-1 at 44, tbl. 8 (comparing the early version of H.B. 589, the version ultimately enacted, and S.B. 824)). However, on June 25, 2013, the Supreme Court issued its opinion in *Shelby County v. Holder* invalidating § 5's coverage formula, after which North Carolina was no longer subject to preclearance. 570 U.S. at 556–57, 133 S.Ct. 2612. Following that ruling, the legislature "requested and received racial data" on the use of various voting practices in the state before "swiftly expand[ing]" the single-issue H.B. 589 into "omnibus legislation." *McCrory*, 831 F.3d at 216. The newly expanded bill included "a number of voting restrictions" that would fall most heavily on minority voters, including stringent voter-ID requirements that excluded "many of the alternative photo IDs used by African Americans." *See id.* at 216–18. H.B. 589 was passed along strict party lines—Republicans in favor, Democrats against—and signed into law on August 12, 2013. *Id.* at 218.

Legal challenges soon followed, and in 2016, the Fourth Circuit struck down H.B. 589 as unconstitutional. *Id.* at 215. As the Fourth Circuit recognized, and as Plaintiffs' experts in this case confirm, voting in North Carolina was and currently is racially polarized; if you know a voter's race, you can often predict how that voter will vote. *See id.* at 225; (ECF No. 91-1 at 52). This dynamic, according to the Fourth Circuit, presents a "political payoff for legislators who seek to dilute or limit the minority vote." *McCrory*, 831 F.3d at 222. The legislature enacted H.B. 589 in pursuit of this payoff; with an "almost surgical precision" it crafted a voter-ID law that permitted only those forms of identification which minority voters disproportionately lacked. *Id.* at 214, 216. Taken together with North Carolina's history of state-sponsored discrimination and the recent rise in minority voting power, H.B. 589 "unmistakably" reflected the legislature's motivation to "entrench itself ... by targeting voters who, based on race, were unlikely to vote for the majority party." *Id.* at 233. The Fourth Circuit unequivocally held that this constituted impermissible racial discrimination "in violation of the Equal Protection Clause of the Fourteenth

Amendment and § 2 of the [VRA]." *McCrory*, 831 F.3d at 219.

**\*4** The bill's proponents sought Supreme Court review, but were denied certiorari. *See North Carolina v. N.C. State Conference of NAACP*, ––– U.S. ––––, 137 S. Ct. 1399, 198 L.Ed.2d 220 (2017). Hours after that denial, legislative leaders began "calling for a new law that would incorporate some of the same ideas in a manner that they thought could withstand judicial review." (*See* ECF No. 91-1 at 15.) Although a Democratic governor was elected in November 2016, Republicans retained their supermajorities in both chambers, thanks, in part, to unconstitutionally gerrymandered legislative maps. (*See* ECF No. 91-1 at 73.) And because the North Carolina Constitution permits the legislature, by three-fifths vote in each chamber, to propose constitutional amendments for popular approval, *see* N.C. Const. art. XIII, § 4, Republican lawmakers were able to use their supermajorities in June 2018 to place the voter-ID amendment on the November ballot. *See* 2018 N.C. Sess. Laws 128.

On November 8, 2018, the voter-ID amendment was adopted by popular vote—55% of the electorate voted in favor.[5] (ECF Nos. 97 at 9; 97-7 at 5.) The language of the amendment proclaims that all North Carolina voters "offering to vote in person shall present photographic identification before voting." N.C. Const. art. VI §§ 2(4), 3(2). Implementation of the amendment, however, is left to the legislature, which "*shall enact* general laws governing the requirements of such photographic identification, *which may include exceptions*." *Id.* (emphasis added).

The November 2018 elections brought changes to the composition of the legislature as well. In August 2016, a three-judge federal district court panel held that the General Assembly unjustifiably relied on race to draw state legislative district lines. *See Covington v. North Carolina*, 316 F.R.D. 117, 124 (M.D.N.C. 2016), *aff'd* ––– U.S. ––––, 137 S. Ct. 2211, 198 L.Ed.2d 655 (2017). The court ordered the maps to be redrawn, and, after a delay, new versions were implemented in time for the 2018 elections.[6] *See Covington v. North Carolina*, 267 F. Supp. 3d 664, 668 (M.D.N.C. 2017). The Republican party retained majorities in both chambers under the new maps, but lost its supermajorities. (*See* ECF No. 91-1 at 70–71.)

In the waning days of the lame-duck 2018 legislative term, the General Assembly enacted S.B. 824 "to implement

the constitutional amendment requiring photographic identification to vote." *See* 2018 N.C. Sess. Laws 144, Title. The Governor vetoed the bill, expressing his view that it "was designed to suppress the rights of minority, poor and elderly voters" and would "trap honest voters in confusion and discourage them with new rules." *See* Governor's Veto Message for SB824, Dec. 14, 2018. However, as one of its last acts, the Senate's supermajority voted to override the Governor's veto on December 18, 2018. The House followed suit on December 19, 2018, and S.B. 824 became law.

## IV. DISCUSSION

Plaintiffs contend that the "the provisions of S.B. 824—both independently and cumulatively—violate Section 2 of the [VRA] ... [as well as] the Fourteenth and Fifteenth Amendments of the United States Constitution."[7] (ECF No. 1 ¶¶ 7–8.) Because S.B. 824 is facially race-neutral, Plaintiffs must "establish that the State ... acted with a discriminatory purpose" in order to demonstrate a likelihood of success on their constitutional claims. *See Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 481–82, 117 S.Ct. 1491, 137 L.Ed.2d 730 (1997) (citing *City of Mobile v. Bolden*, 446 U.S. 55, 62, 100 S.Ct. 1519, 64 L.Ed.2d 47 (1980) (plurality opinion) (explaining that facially neutral actions only violate the Fourteenth and Fifteenth Amendments if motivated by discriminatory purpose). In contrast, "a violation of § 2 [of the VRA] c[an] be proved by showing discriminatory *effect alone*," without having to show a discriminatory purpose. *Thornburg v. Gingles*, 478 U.S. 30, 35, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986) (emphasis added); *see also Lee v. Virginia State Bd. of Elections*, 843 F.3d 592, 599 (4th Cir. 2016).

**\*5** The Court will begin its discussion, therefore, with Plaintiffs' likelihood of success in demonstrating that discriminatory purpose was a motivating factor behind the passage of S.B. 824. Afterwards, the Court will consider whether S.B. 824's likely effects would be independently sufficient to violate § 2.

### A. Discriminatory Intent Based on Race

Facially neutral laws that are motivated by invidious intent are "just as abhorrent, and just as unconstitutional, as laws that expressly discriminate on the basis of race." *McCrory*, 831 F.3d at 220 (citing *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264–66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis*, 426 U.S. 229, 241, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)). While "[p]roof of racially discriminatory intent or purpose is required to show a

violation of the Equal Protection Clause," *Arlington Heights*, 429 U.S. at 265, 97 S.Ct. 555, rare is the modern case in which the government has been candid about its discriminatory motives. *See Hunt v. Cromartie*, 526 U.S. 541, 553, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) ("Outright admissions of impermissible racial motivation are infrequent."); *Johnson v. De Grandy*, 512 U.S. 997, 1018, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994) (acknowledging the shift away from "direct, overt impediments" toward "more sophisticated devices that dilute minority voting strength"). Thus, when evaluating a discriminatory intent claim, a court must dig deeper and make a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266, 97 S.Ct. 555.

In *Arlington Heights*, the Supreme Court set forth a non-exhaustive list of factors to guide this delicate investigation. Reviewing courts should consider: (1) the law's historical background; (2) the specific sequence of events leading up to the law's enactment, including any departures from normal legislative procedure; (3) the law's legislative and administrative history; and (4) whether the law's effect "bears more heavily on one race than another." *Id.* at 266–68, 97 S.Ct. 555. The Court further cautioned that, because legislative bodies are "[r]arely ... motivated solely by a single concern," a challenger need only demonstrate that "invidious discriminatory purpose was *a* motivating factor." *Id.* at 265–66, 97 S.Ct. 555 (emphasis added). "[T]he ultimate question," then, is whether a law was enacted "because of," and not "in spite of," the discriminatory effect it would likely produce. *McCrory*, 831 F.3d at 220 (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979)).

If "racial discrimination is shown to have been a 'substantial' or [a] 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter v. Underwood*, 471 U.S. 222, 228, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985). At this step, the court must "scrutinize the legislature's *actual* non-racial motivations to determine whether they *alone* can justify the legislature's choices." *McCrory*, 831 F.3d at 221 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). Further, because "racial discrimination is not just another competing consideration," the typical judicial deference accorded to legislators' "competing considerations" is "no longer justified." *Id.* at 221 (quoting *Arlington Heights*, 429 U.S. at 265–66, 97

S.Ct. 555). Put another way, "the state's proffered non-racial interest" must be "sufficiently strong to cancel out" any discriminatory motive. *Id.* at 234 (quoting *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 614 (2d Cir. 2016)).

### 1. Historical Background

**\*6** "A historical pattern of laws producing discriminatory results provides important context for determining whether the same decisionmaking body has also enacted a law with discriminatory purpose." *McCrory*, 831 F.3d at 223–24. While "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful," the historical background against which the challenged law was enacted is undoubtedly "relevant to the question of intent." *See Abbott v. Perez*, ––– U.S. ––––, 138 S. Ct. 2305, 2324–25, 201 L.Ed.2d 714 (2018) (quoting *Mobile*, 446 U.S. at 74, 100 S.Ct. 1519 (plurality opinion)); *Arlington Heights*, 429 U.S. at 267, 97 S.Ct. 555).

As the Fourth Circuit recognized in *McCrory*, and as earlier discussed here, North Carolina has a sordid history of racial discrimination and voter suppression stretching back to the time of slavery, through the era of Jim Crow, and, crucially, continuing up to the present day. *See* 831 F.3d at 223–27. Between 1980 and 2013, the Department of Justice "issued over fifty objection letters to proposed election law changes in North Carolina ... because the State had failed to prove the proposed changes would have no discriminatory purpose or effect." *Id.* at 224 (citing U.S. Dep't of Justice, Civil Rights Div., Voting Determination Letters for North Carolina (Aug. 7, 2015), https://www.justice.gov/crt/voting-determination-letters-north-carolina). During that same time period, "plaintiffs brought fifty-five successful cases under § 2 of the [VRA]," ten of which resulted in "judicial decisions finding that electoral schemes ... had the effect of discriminating against minority voters." *Id.* (citing Anita S. Earls et al., *Voting Rights in North Carolina: 1982–2006*, 17 S. Cal. Rev. L. & Soc. Just. 577 (2008)). And *McCrory* itself revealed that, in 2013, the state was engaged in the most "targeted" and "comprehensive" efforts to suppress minority voting since the 1960s. *See id.* at 223, 227.

Moreover, the legislature has continued to violate both the VRA and the Constitution. In 2016, for instance, federal courts concluded that North Carolina's legislative and congressional maps contained intentional racial gerrymanders. *See Harris v. McCrory*, 159 F. Supp.

3d 600, 605, 627 (M.D.N.C. 2016) (concluding that "race predominated" in the General Assembly's drawing of Congressional maps); *Covington*, 316 F.R.D. at 178 (invalidating state legislative maps "primarily [due] to the explicit and undisputed" racial methodology "that the General Assembly employed in the[ir] construction"). According to Plaintiffs' expert Barry Burden, "[t]hese recent cases demonstrate that in the post-*Shelby* environment the state legislature has repeatedly acted—intentionally—to alter the North Carolina election system in ways that disproportionately dilute or deny [minority voting power]." (*See* ECF No. 91-4 at 15.) Defendants do not challenge this understanding. (*See* ECF No. 97 at 18.)

Another "critical" piece of historical evidence to consider is the degree to which voting in North Carolina has been, and remains racially polarized. *See McCrory*, 831 F.3d at 225. In 2016, the Fourth Circuit noted that, "racially polarized voting between African Americans and whites remains prevalent in North Carolina," where "race and party are inexorably linked." *Id.* The evidence before this Court confirms that, three years later, this is still the case. As Plaintiffs' expert Allan Lichtman reports, in the 2016 elections, non-white voters supported Republican candidates for president and state-wide office at a level of 19%, compared to a support level of 63% among white voters. (ECF No. 91-1 at 57, 60.) African American voters were particularly hesitant to support Republican candidates—on average, just 10% cast their ballots for the GOP. (*Id.*)

**\*7** *Amici* posit that this stark polarization may, in fact, be diminishing. (*See* ECF No. 117 at 33 (noting that, according to Lichtman, a higher percentage of African American voters supported the Republican presidential candidate in 2016 than in 2008).) That could be the case. However, the evidence still shows that the state's electorate was extremely polarized at the time S.B. 824 was enacted and will predictably remain so in the near future, even if the trend is moving slightly toward lesser polarization. (*See* ECF No. 91-1 at 52–57 (demonstrating the "substantial racial polarization that exists in general elections in North Carolina").)

All this is to say that "powerful undercurrents" of racial discrimination and racial polarization have historically pervaded North Carolina's political climate—and still do. *See McCrory*, 831 F.3d at 226. As the Fourth Circuit found with respect to H.B. 589, S.B. 824 likewise "cannot be properly understood without these considerations," as they indicate both a past and current practice of and incentive to

limit certain groups' access to the franchise. *Id.* Accordingly, the historical context weighs in favor of a finding of discriminatory intent with respect to S.B. 824's enactment.

2. The Sequence of Events Leading to S.B. 824's Enactment

The "specific sequence of events leading up to the challenged [law]" may also "spark suspicion" of impropriety and "shed some light on [lawmakers'] purposes." *Arlington Heights*, 429 U.S. at 267, 269, 97 S.Ct. 555. Defendants rightly assert that "[t]he process of SB824's enactment complied with [state] constitutional and parliamentary requirements." (*See* ECF Nos. 97 at 22; 97-18 at 10.) While "a legislature need not break its own rules to engage in unusual procedures," *McCrory*, 831 F.3d at 228, it must be acknowledged that, here, there appears to have been no deviation from the procedural letter: the bill passed three separate readings in each chamber; contains the required phrase "The General Assembly of North Carolina enacts:"; was signed by the presiding officers of each chamber; was submitted to the Governor for approval or veto; and, after the Governor's veto, was enacted by override. (ECF No. 97-18 at 3–4, 10.)

Plaintiffs do not dispute that the General Assembly followed legislative protocol. Nonetheless, they insist that the events leading to S.B. 824's passage were abnormal. (*See* ECF No. 91 at 26–27.) First, Plaintiffs contend that S.B. 824 was enacted in a suspiciously hurried fashion—"the same sort of 'rushed ... legislative process' and lack of debate that accompanied the passage of HB589." (*Id.* at 26.) Indeed, numerous procedural irregularities accompanied the passage of H.B. 589: a previously slim bill sat for months before conspicuously swelling in size right after the *Shelby County* decision; the newly "omnibus" bill was pushed through with only "one day for a public hearing, two days in the Senate, and two *hours* in the House"; there was little opportunity to present amendments to the bill; and the ultimate vote "proceeded on strict party lines." *See McCrory*, 831 F.3d at 227–28. However, if S.B. 824's path resembles this "rushed" process, it is only to a lesser degree.

S.B. 824 was given five days of legislative debate. (*See* ECF No. 108 at 10); S.B. 824 Legislative History, https://www.ncleg.gov/BillLookUp/2017/s% 20824. Plaintiffs have submitted evidence that, while the bill was under consideration, "[v]ery little time was permitted for public questions or comments, and what time was given was provided with insufficient or no notice to the public." (*See*

ECF No. 91-8 ¶¶ 32–37.) Be that as it may, *some* public commentary was allowed, both for or against the bill. (*See* ECF No. 97-16.) Moreover, in contrast to the bulldozer-like process described in *McCrory*, a total of twenty-three amendments to S.B. 824 were offered, thirteen of which were adopted before final passage. (*See* ECF No. 97-18 at 7–8.)

**\*8** Defendants also emphasize that, in addition to an open process, S.B. 824 enjoyed allegedly "bipartisan" support. The Fourth Circuit seems to have acknowledged that evidence of bipartisanship can cut against a finding of discriminatory intent. *See Lee*, 843 F.3d at 603 ("While there was a substantial party split on the vote enacting the law, two non-Republicans (one Democrat and one Independent) voted for [Virginia's photo-ID law]."); *McCrory*, 831 F.3d at 227 (noting that "[f]ive House Democrats joined all present Republicans" in voting for the pre-*Shelby County* version of H.B. 589). However, the Court is doubtful that the minimal aisle-crossing that took place during S.B. 824's passage should carry any significant weight. S.B. 824's lone Democratic sponsor, Senator Joel Ford, lost his primary in the 2018 election and admitted at deposition that he considered switching parties around the time the bill was being drafted. (*See* ECF No. 97-6 at 99–100.) Furthermore, when it came time to override the Governor's veto, only one Democrat in each chamber—Ford in the Senate and Representative Duane Hall in the House—voted to do so. (ECF Nos. 97-23; 97-24.) Defendants' depiction of S.B. 824 as a bill with "bipartisan support ... through each important stage of the lawmaking process" is, therefore, a bit misleading. (ECF No. 97 at 28.)

Plaintiffs' more potent sequence-related argument is less about "how" than "who." In their view, the events which produced S.B. 824 are "part of an unbroken effort ... to protect partisan gains by disadvantaging Black and Latino voters"—not just by the same party, but by the same *individual legislators*. (ECF No. 108 at 4–5.) Legislative voting records reveal that, while the composition of the General Assembly had changed somewhat in the time between 2013 and 2018, a majority of the Republican legislators who voted for S.B. 824 had previously voted for H.B. 589. (*See* ECF Nos. 91-1 at 17, tbl. 1.) Moreover, "many of the same legislative leaders who championed HB589 ... were instrumental in enacting SB824." [8] (*See* ECF No. 91 at 17–18.) This fact is particularly striking in light of Defendants' admission that there were no "changes in legislative policy preferences leading to the enactment of SB824." (ECF No. 97 at 20.) Of course, views can change. However, "discriminatory intent does tend to persist through time." *United States v. Fordice*, 505 U.S.

717, 747, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992) (Thomas, J., concurring). It therefore seems "eminently reasonable to make the State bear the risk of nonpersuasion with respect to intent" when the very same people who passed the old, unconstitutional law passed the new. *See id.*

Finally, Plaintiffs argue that the legislature would not have been able to enact S.B. 824 without supermajorities obtained via an "unlawful racial gerrymander." (ECF No. 91 at 21.) Based on this Court's research, Defendants are correct that no federal court has held that "a state legislature is barred from legislating before curative map-making periods are completed," [9] (ECF No. 97 at 27–28), and Plaintiffs have not asked this Court to wade into that thicket. Nevertheless, the legislature's status as the product of unconstitutional mapmaking must be considered as an integral part of S.B. 824's origins. To paraphrase Plaintiffs: but for the effect of unconstitutional legislative maps, S.B. 824's supporters may not have obtained supermajorities in the House and Senate; may not have had the three-fifths support necessary to place a voter-ID amendment before the public; and may not have been capable of overriding the Governor's veto. (*See* ECF No. 108 at 7–13.) This argument, while not dispositive, is not without force.

**\*9** In sum, the "sequence of events" is mixed. The General Assembly appears to have met all parliamentary requirements, both in placing a constitutional amendment before voters [10] and in passing S.B. 824 as implementing legislation, and, while perhaps more "rushed" than usual, provided for legislative debate. Nevertheless, when viewed with a wider lens, the circumstances surrounding S.B. 824 are unusual: A majority of the Republican legislators who supported H.B. 589 also voted for S.B. 824, and the same legislative leaders spearheaded both bills. Further, those legislators were elected, at least in part, by way of district maps which were declared unconstitutional. And after voters ratified the voter-ID amendment, S.B. 824 was enacted along (virtually) strict party lines and over the Governor's veto. These sequential facts constitute evidence that S.B. 824 was motivated by discriminatory intent, despite the apparent lack of procedural irregularity.

### 3. S.B. 824's Legislative History

A challenged law's legislative history "may be highly relevant" to the question of intent, "especially where there are contemporaneous statements by members of the

decisionmaking body, minutes of its meetings, or reports." *Arlington Heights*, 429 U.S. at 268, 97 S.Ct. 555. The public statements made by S.B. 824's advocates and opponents reveal three main sentiments. First, Republican legislative leaders strongly disagreed with the Fourth Circuit's decision in *McCrory*. Immediately after the court's ruling was announced, Senate Leader Phil Berger and House Speaker Tim Moore issued a statement criticizing it as a decision "by three partisan Democrats" with "the intent to reopen the door to voter fraud." (*See* ECF No. 91-1 at 14–15.) Speaker Moore would later opine that the Fourth Circuit "has a more liberal political bent [and] acted outside of what has been upheld by the U.S. Supreme Court in similar matters." (*Id.* at 15.) And in expressing his support for a constitutional amendment, Representative David Lewis, Chair of the House Committee on Elections, explained that "[t]he reason we are asking voters if they want to do this or not is, frankly, we think we passed a good law before." (*Id.*)

Second, Republican lawmakers remained "a hundred percent committed to the idea of voter ID" after *McCrory* and set out to craft a new bill which would "mute future court challenges." (*Id.* at 16 (quoting Rep. Lewis).) The choice to put a voter-ID amendment before the public appears to have been motivated, at least in part, by a desire to insulate the future S.B. 824 from "inevitable [legal] challenges that will come from the left." (*Id.*) In floor debate, for example, Representative John Blust expressed his belief that a constitutional amendment was needed "so that the North Carolina Supreme Court can't simply get rid of it by saying 'Oh, the legislature just added an additional qualification to vote.' " (*Id.*) Defendants assert that these statements are consistent with a desire to "enact legislation that abides by legal precedent." (ECF No. 97 at 21.) However, given the history and sequence of events discussed above, the fairer interpretation is that these statements reflect a desire to evade precedent, rather than abide by it.

Third, the legislative history suggests that lawmakers' positions remained virtually unchanged between the time *McCrory* was issued and the time S.B. 824 was finalized. S.B. 824's opponents continued to voice their concern that, like H.B. 824, the new bill could cause "specific populations['] ... participation in the vote [to] go down because of [an] additional burden on voting." (ECF No. 97-16 at 663 (statement of Rep. Meyer); 673 (statement of Rep. Michaux) ("[T]he only reason that you can give is to suppress the vote.").) One Democratic lawmaker was relieved, however, that S.B. 824 wasn't "as restrictive or burdensome as some

[had] feared." (*See id.* at 139 (statement of Sen. Woodard).) At least one other thanked Republicans for an "earnest effort to try to expand [the bill] significantly beyond what it was when the last voter ID bill came before us," though concerns about S.B. 824's potential impact still remained. (*See id.* at 170 (statement of Sen. McKissick).) Meanwhile, the record shows that supporters of the bill were adamant, as they had been in 2013, that voter fraud was a pressing issue in North Carolina. (*See, e.g.*, *id.* at 318 (statement of Rep. Speciale) ("There was cheating, there was fraud going on."); 335 (statement of Rep. Warren) (expressing his belief that "duplicate voting occurs, and it occurs in high enough volume that it can affect the outcome of an election").)

**\*10** In addition to the statements discussed above, two proposed changes to the bill—one adopted, the other rejected—are worth mentioning. In *McCrory*, the Fourth Circuit questioned H.B. 589's requirement that ID was needed for in-person voting, but not for absentee voting. Absentee voting is disproportionately used by white voters; knowing this, the authors of H.B. 589 "exempted absentee voting from the photo ID requirement" while "drastically restrict[ing] ... other forms of access to the franchise." *McCrory*, 831 F.3d at 230. The lack of a voter-ID requirement for absentee voting also suggested to the court that the legislature's proffered non-racial justifications—combating voter fraud and increasing confidence in elections—were pretextual. *See id.* at 235. Whereas the legislature "failed to identify even a single individual who ha[d] ever been charged with committing in-person voter fraud in North Carolina," the legislature "*did* have evidence of alleged cases of mail-in absentee voter fraud," but chose not to address the problem. *See id.* S.B. 824's legislative history displays an effort to correct this discrepancy, albeit a reluctant one. Until late 2018, voter-ID proponents appeared relatively unconcerned about absentee voter fraud. The first version of what would eventually become S.B. 824 required voter ID for in-person voting only. (*See* ECF No. 91-1 at 124.) Likewise, the language of the voter-ID amendment, drafted by the legislature, only requires photo ID from voters "offering to vote in person." N.C. Const. art. VI §§ 2(4), 3(2). However, in November 2018, the State Board of Elections ("SBOE") declined to certify election results in North Carolina's 9th Congressional District as news swirled about significant absentee ballot fraud in Bladen County. (*See* ECF No. 91-1 at 124.) A few days later, the legislature introduced a substitute bill which, for the first time, addressed absentee ballots. *Id.* at 125. Thus, while the final text of S.B. 824 appears to tackle the discrepancy between absentee and in-person voting highlighted in *McCrory*, the

legislative history suggests that its drafters only did so under intensifying public pressure.

Also noteworthy in the legislative history is the decision not to include public-assistance IDs as an acceptable form of identification. Here again, the Fourth Circuit in *McCrory* specifically singled out the omission of public-assistance IDs as evidence that H.B. 589 was imbued with discriminatory intent, recognizing, as the district court had, that "the removal of public assistance IDs in particular was suspect because a reasonable legislator ... could have surmised that African Americans would be more likely to possess this form of ID." *McCrory*, 831 F.3d at 227–28 (internal quotations omitted). However, unlike with absentee ballots (and despite urgings from Democratic legislators), the General Assembly did not choose to alter S.B. 824 to permit voters to use public-assistance IDs. An amendment to the bill proposed by Representative Bobbie Richardson—which was rejected— would have permitted voters to use any "identification card issued by a branch, department, agency, or entity of the United States or [North Carolina] for a government program of public assistance," so long as that ID contained a photograph. (*See* ECF No. 108-3 at 16.) The decision not to include this form of identification in S.B. 824, despite the attention given to it in *McCrory*, is, as it was with H.B. 589, particularly suspect. *See* 831 F.3d at 227.

At the end of this discussion of legislative history, there is one final item to address. Central to the Fourth Circuit's discriminatory intent analysis in *McCrory*—indeed, the smoking gun—was the fact that "prior to and during the limited debate on the expanded omnibus bill, members of the General Assembly requested and received a breakdown" of voter behavior "by race," which they then used to target African American voters. *Id.* at 230. The Fourth Circuit "[could not] ignore the choices the General Assembly made with this data in hand." *Id.* As Defendants point out, the legislative record before the Court in this case "features no such evidence." (ECF No. 97 at 29–30.) However, as explained above, the same key legislators who championed H.B. 589 were the driving force behind S.B. 824's passage just a few years later—they need not have had racial data in hand to still have it in mind.

To summarize, the legislative history reveals that the General Assembly's goals and motivations went virtually unchanged in the time between H.B. 589 and S.B. 824. Rather than taking steps to purge the taint of discriminatory intent, the bill's supporters expressed their resolve to circumvent *McCrory*

and stave off future legal challenges. While racial data was not explicitly requested during the formal consideration of S.B. 824, as it had been a few years earlier with H.B. 589, the legislators who previously used racial data to target minority voters with "surgical precision" must have understood S.B. 824's potential to affect a disparate impact. Further, the rejection of an amendment which would have permitted the use of public-assistance IDs remains, as it was before in *McCrory*, particularly suspect here. Each of these aspects of the legislative history supports a finding that the enactment of S.B. 824, like its predecessor, was imbued with discriminatory intent.

### 4. Whether S.B. 824 "Bears More Heavily on One Race Than Another"

**\*11** The final *Arlington Heights* consideration is the "impact of the official action"—that is, whether the challenged law "bears more heavily on one race than another." 429 U.S. at 266, 97 S.Ct. 555 (quoting *Washington*, 426 U.S. at 242, 96 S.Ct. 2040). When a plaintiff contends that a law was motivated by invidious intent, proof of disparate impact is not "the sole touchstone" of the claim. *McCrory*, 831 F.3d at 231 (citing *Washington*, 426 U.S. at 242, 96 S.Ct. 2040). However, it would seem that at least *some* showing of disproportionate impact—"even if it is not overwhelming impact"—is required. *See id.*; *cf. Palmer v. Thompson*, 403 U.S. 217, 224, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971) ("[N]o case in this Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it.").

In *McCrory*, the Fourth Circuit concluded that African Americans disproportionately lacked the kinds of photo ID required by H.B. 589. 831 F.3d at 231. This discrepancy was sufficient to establish a disparate impact for the purposes of an *Arlington Heights* analysis—not just for its standalone effect, but also for its contribution to the greater, cumulative disenfranchisement worked by H.B. 589's various restrictions. *See id.* at 230–31 (citing *City of Memphis v. Greene*, 451 U.S. 100, 110, 126, 101 S.Ct. 1584, 67 L.Ed.2d 769 (1981); *Clingman v. Beaver*, 544 U.S. 581, 607–08, 125 S.Ct. 2029, 161 L.Ed.2d 920 (2005) (O'Connor, J., concurring)). As explained below, Plaintiffs have presented evidence suggesting that minority voters still disproportionately lack qualifying identification under S.B. 824, despite the fact that more kinds of ID are accepted under this law than under H.B. 589. However, S.B. 824

contains additional provisions not present in H.B. 589—most notably access to free, state-issued IDs and the presence of an expanded reasonable impediment provision—which could significantly limit any ill effects. *See Lee* 843 F.3d at 603 (noting, with seeming approval, that "the Virginia legislature went out of its way to make [the impact of its voter-ID law] as burden-free as possible."). Because impact is simply "*one* of the circumstances evidencing discriminatory intent" under an *Arlington Heights*, totality-of-the-circumstances analysis, *see McCrory*, 831 F.3d at 231, the *size* of the impact—rather than just its existence—matters. Accordingly, the Court cannot simply rely on a combination of disparate ID possession and the *McCrory* decision to determine S.B. 824's impact. Rather, an independent analysis of S.B. 824's likely effect is necessary in order to give this factor its proper weight.

### a. *S.B. 824's Provisions*

Before evaluating S.B. 824's likely impact, an initial summary of the bill's provisions is in order. The core of S.B. 824 is its requirement that all voters, whether voting in person or by absentee ballot, "produce" an acceptable form of identification which "contain[s] a photograph of the registered voter."[11] 2018 N.C. Sess. Laws 144 § 1.2.(a). Ten different forms of ID are authorized:

1. North Carolina driver's licenses;

2. Other nontemporary IDs issued by the Division of Motor Vehicles ("DMV");

3. United States passports;

4. North Carolina voter photo ID cards;

5. Tribal enrollment cards issued by state- or federally recognized tribes;[12]

6. Certain student IDs issued by post-secondary institutions;

7. Certain employee IDs issued by a state or local government entity;

8. Out-of-state driver's licenses and nonoperator IDs (if voter is newly registered);

9. Military IDs; and

10. Veterans IDs.

*Id.* The first eight forms of ID may only be used if "valid and unexpired, or ... expired for one year or less."[13] *Id.* However, the two remaining forms—military and veterans IDs—may be used "regardless of whether the identification contains a printed expiration or issuance date."[14] *Id.* The bill makes an exception to these expiration terms for voters age sixty-five and older; such voters may use expired IDs of any authorized kind, so long as they were unexpired on their sixty-fifth birthdays. *Id.*

**\*12** Student and government employee IDs are not automatically accepted. Rather, academic institutions and public employers must apply to have their IDs approved for use in voting. *See* 2019 N.C. Sess. Laws 22. The statutory deadline for approved use in all 2020 elections was December 1, 2019. *Id.* § 6.(b). While approximately 850 colleges, universities, and government employers are eligible, as of this time, only 118 have received approval from the SBOE for use in the coming year. *See* Acceptable Photo IDs for Voting in 2020, *available at* https://www.ncsbe.gov/voter-ID (last visited Dec. 29, 2019); (ECF No. 91-4 at 24 n.95).

S.B. 824 further provides for the issuance of free "voter photo identification cards" upon request. Voters can obtain these IDs in two ways. First, voters can visit their county boards of elections and receive IDs "without charge." 2018 N.C. Sess. Laws 144 § 1.1.(a). To obtain an ID from a county board, a voter must visit in person and provide her name, date of birth, and the last four digits of her social security number; no additional documentation is required.[15] *Id.* Second, voters over the age of seventeen are eligible to receive a free nonoperator ID card from the DMV. *Id.* § 1.3. (a). Although this method does require certain underlying documentation to prove identity, such as a birth certificate, the state must supply the necessary documents free of charge if the voter does not have copies. *Id.* § 3.2.(b). Relatedly, if a voter's "driver's license, permit, or endorsement" has been "seized or surrendered due to cancellation, disqualification, suspension, or revocation under applicable State law," the DMV must automatically mail that voter a special replacement identification card which can be used for voting. *Id.* § 1.3.(a).

When a voter arrives to vote and presents identification, precinct officials must "compare the photograph contained on the required identification with the person presenting to vote." *Id.* § 1.2.(a). If the precinct official "disputes that the photograph contained on the required identification is the

person presenting to vote," the voter will still be permitted to vote unless "the judges of election present unanimously agree that the photo ... does not bear a reasonable resemblance to that voter." *Id.*

Exemptions to S.B. 824's photo ID requirement are provided under three circumstances. *Id.* § 1.2.(a). Voters who (1) have religious objections to being photographed, (2) are the victims of a recent natural disaster, or (3) face a "reasonable impediment" to obtaining and presenting a qualifying ID, may still cast "provisional" ballots without presenting ID. *Id.* In all three instances, voters must complete an affidavit, under penalty of perjury, affirming their identities and their reasons for not presenting identification. *Id.* Once an affidavit is submitted, the county board of elections "shall find that the provisional ballot is valid unless [it] has grounds to believe the affidavit is false." *Id.* The procedures for completing and evaluating these affidavits are discussed in greater detail below.

Alternatively, if a voter has an acceptable ID, but fails to bring it to the polls, that voter may cast a provisional ballot and later return to the county board to 'cure' it. *Id.* § 1.2.(a). To do so, the voter must present the county board with an acceptable form of ID no later than the day before the election is canvassed. *Id.*

**\*13** S.B. 824 further empowers "[t]he chair of each political party in the State ... to designate up to 100 additional at-large [poll] observers," over and above the two observers already allotted for each individual precinct and the ten intracounty at-large observers appointed by county party chairs. *Id.* § 3.3; N.C. Gen. Stat. § 163-45.

Lastly, S.B. 824 expands the grounds for "ballot challenges" to include lack of proper photo ID. North Carolina law permits "any ... registered voter of the county" to challenge another voter's registration and eligibility in certain circumstances. *See* 2018 N.C. Sess. Laws 144 § 3.1.(c); N.C. Gen. Stat. § 163-87. When a challenge is entered, precinct officials must "explain to the challenged registrant the qualifications for registration and voting[,] ... examine him as to his qualifications to be registered and to vote[,] ...[and] tender to him [an] oath or affirmation" which affirms his identity. *Id.* § 163-88. Thereafter, if the precinct officials are "satisfied that he is a legal voter" they "shall overrule the challenge and permit him to vote." *Id.* The grounds for exercising challenges were formerly limited to suspicion of defective registration or duplicate voting. However, S.B. 824 expands the reasons for

challenge to include "[t]he registered voter does not present photo identification in accordance with [S.B. 824]." [16] *Id.* at § 163-87; 2018 N.C. Sess. Laws 144 § 3.1.(c).

### b. *Evidence of S.B. 824's Likely Impact*

The Court now turns to the evidence of S.B. 824's likely impact in order to assess whether, as Plaintiffs contend, it "bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266, 97 S.Ct. 555. There is no denying that S.B. 824 permits voters to use a wider variety of IDs to cast their ballots than H.B. 589. [17] Under the version of H.B. 589 considered in *McCrory*, for example, no student and local government IDs were accepted—under S.B. 824, some are (although not without prior approval from the SBOE). (*See* ECF No. 91-1 at 44.) However, the important metric for the Court's purposes isn't so much the *variety* of IDs as how readily they are possessed by North Carolinians of different backgrounds. In this sense, what is most striking about the state's newly expanded list of IDs is that it continues to primarily include IDs which minority voters disproportionately lack, and leaves out those which minority voters are more likely to have.

The SBOE recently conducted an analysis in which it cross-referenced DMV records with state voter registration lists. (*See* ECF 91-4 at 29–30.) The overall "no-match" rate—that is, the percentage of registered voters without a DMV-issued ID—was 8.1%. (ECF No. 91-11 at 18–19.) When sorted by race and ethnicity, however, the data reveals large discrepancies in DMV-issued-ID possession rates. For example, 10.6% of African American voters are unmatched, versus just 6.5% of white voters. (ECF No. 91-11 at 22, tbl. 3.) Similarly, 11.1% of Hispanic voters are unmatched, compared to just 5.7% of non-Hispanics. (*Id.* at 26, tbl. 5.) The takeaway is that African American and Hispanic voters are less likely than whites to have some of the most common forms of identification that can be used to vote under S.B. 824 —driver's licenses and other DMV-issued IDs.

**\*14** The record evidence further suggests substantial disparities between white and non-white voters with respect to other acceptable forms of ID as well. Though less precise than the "matching" conducted by SBOE, results from the Survey of the Performance of American Elections ("SPAE") —a respected independent study—demonstrate that 15.1% of African Americans lack *any* acceptable form of ID under S.B. 824. (*See* ECF No. 91-1 at 26.) By comparison, only 4.1%

of whites surveyed were without qualifying ID—an 11-point difference. (*Id.* at 26–27.)

The SPAE findings also demonstrate that African American voters are more likely than white voters to have public-assistance IDs, which are *not* accepted under S.B. 824. (*See id.* at 27.) Recall that in *McCrory* the Fourth Circuit found the omission of public-assistance IDs to be particularly suspect given the widely recognized socioeconomic realities many voters of color face. *See McCrory*, 831 F.3d at 227–28. According to Professor Lichtman, "adding public assistance IDs makes a major difference" in possession rates: when public-assistance IDs are included, "the percentage of African Americans lacking photo IDs drops ... from 15.1% to 8.4%," whereas the percentage of whites lacking photo ID drops from 4.1% to 3.2%. [18] (*See* ECF No. 91-1 at 27.)

African Americans are also more likely than whites to possess government employee IDs. (*Id.* at 50.) However, aside from military IDs, federal employee IDs are completely excluded under S.B. 824. Moreover, only a relatively small number of state and local government employee IDs have been approved for use in the 2020 elections. *See* Acceptable Photo IDs for Voting in 2020, *available at* https://www.ncsbe.gov/voter-ID (last visited Dec. 29, 2019). Thus, the evidence suggests that minority voters are not just less likely to have an acceptable form of ID, but that the legislature excluded photographic ID that could have greatly reduced that discrepancy.

Other features of the bill could expand the gap in ID possession in subtle ways. For example, under H.B. 589, the cut-off for use of expired IDs was age 70, rather than 65. (See ECF No. 91-1 at 45.) This change should make voting with ID easier for older North Carolinians. However, due to North Carolina's age structure, the change could also further widen S.B. 824's disparate impact—24.2% of the state's white population is 65 or older, compared to just 16.1% of African Americans. (*Id.*)

Unlike its predecessor, S.B. 824 makes two forms of ID available to voters "without charge." This is undoubtedly an improvement over the old law. However, the reality is that these forms of ID are not entirely "free" to those who need them most. In *Crawford v. Marion County Election Board*, Justice Stevens reasoned that "[f]or most voters who need [ID], the inconvenience of making a trip to the [DMV], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase

over the usual burdens of voting." 553 U.S. 181, 199, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008) (plurality opinion). However, the evidence in this case suggests otherwise. It makes sense that, for many individuals, having the option to get a state-issued ID at no charge *is* a convenience. For those struggling to navigate daily life, however, making a trip to the county board or the DMV during open hours can be prohibitively costly. As Professor Burden explains, "[b]oth options for acquiring ID make demands on a person's time and impose transportation costs because the individual must present themselves in person to apply." (ECF No. 91-4 at 32.) Because African Americans and Hispanics are "less likely than whites to live in households where a vehicle is readily available," accessing state-issued ID can be challenging. (*Id.*; *see also* ECF No. 108-1 at 29.) A 2014 study conducted through Harvard Law School found that "the expenses for documentation, travel, and waiting time" associated with obtaining free ID "are significant—especially for minority group and low-income voters—typically ranging from about $75 to $175." [19] *See* Richard Sobel, *The High Cost of 'Free' Photo Voter Identification Cards* 2 (2014) (cited in ECF No. 91-4 at 32). This could explain why, as of October 21, 2019, only 1,720 "free" IDs were issued in a state with millions of eligible voters. (ECF No. 97-9 at 6–7.)

**\*15** There is good reason to believe, therefore, that minority voters (a) are less likely than white voters to already possess an ID that they can use for voting and (b) will have a harder time accessing the no-charge IDs made available by the state. Just how consequential these disparities become in practice, however, will depend on the effectiveness of S.B. 824's "reasonable impediment" exception, which enables voters to cast ballots *without* having to present ID.

In order to exercise the reasonable impediment option at the polls, voters must complete affidavits affirming their identities and their reasons for not presenting identification. Further, a "reasonable impediment declaration form" ("RID") must accompany a voter's affidavit, the content of which is prescribed by S.B. 824:

> The State Board shall adopt a reasonable impediment declaration form that, at a minimum, includes the following as separate boxes that a registered voter may check to identify the registered voter's reasonable impediment:
>
> (1) Inability to obtain photo identification due to:
>
> a. Lack of transportation.

b. Disability or illness.

c. Lack of birth certificate or other underlying documents required.

d. Work schedule.

e. Family responsibilities.

(2) Lost or stolen photo identification.

(3) Photo identification applied for but not yet received by the registered voter voting in person.

(4) Other reasonable impediment. If the registered voter checks the "other reasonable impediment" box, a further brief written identification of the reasonable impediment shall be required, including the option to indicate that State or federal law prohibits listing the impediment.

2018 N.C. Sess. Laws 144 § 1.2.(a). A reasonable impediment ballot "shall" be counted "unless the county board has grounds to believe the [RID] is *false*," and, per the language of the bill, may not be denied for any other reason. *Id.* (emphasis added). To reject a ballot as "false," the five-member, bipartisan county board must unanimously agree on its falsity. *See* 08 N.C. Admin. Code 17.0101(b).

Plaintiffs contend that, under S.B. 824, "the decision whether to accept an RID [is] unacceptably arbitrary." (ECF No. 91 at 34.) Indeed, the bill itself provides little guidance as to what sorts of "grounds" would be sufficient to demonstrate that a declaration is "false," opening the door to subjectivity. Curiously, Defendants argue that this ambiguity is a feature, not a bug. Pressed on this issue at oral argument, Defendants' counsel stated that "it's hard to conceive of how a County Board member would come up with grounds to believe what the person said was false," much less convince four additional board members to share that belief. (ECF No. 119 at 112.) In this way, Defendants argue, the reasonable impediment provision operates as a true catch-all: no matter the reason for failing to present an ID, a voter's ballot will be accepted.[20]

Frankly, the Court is doubtful that RIDs are the panaceas that Defendants make them out to be. The experience of North Carolina's March 2016 primary—the only election in the state's history conducted under a voter-ID law featuring a reasonable impediment provision—is informative. (*See* ECF No. 91-1 at 35.) In that race, 2,327 aspiring

voters cast provisional ballots, 1,353 (58%) of which ultimately went uncounted.[21] (*Id.*) Of the 1,353 people who traveled to the polls on election day only to have their vote discounted, a disproportionate number were African American. (*Id.*) This disenfranchisement occurred despite the existence of a reasonable impediment option,[22] apparently because poll workers did not provide voters with the proper provisional ballots, arbitrarily rejected reasonable impediment provisional ballots, or otherwise failed to assist would-be voters as they filled out their reasonable impediment paperwork. (*Id.* at 38–40.)

**\*16** The Court is not yet convinced that S.B. 824's reasonable impediment provision will resolve these issues. On the administrative side, it appears that the SBOE has neither adopted an RID form for use in the 2020 primaries nor started training county boards and poll workers on how to inform voters about RIDs, efficiently complete them, or judge their veracity. (*See* ECF No. 91-4 at 37–38.) Moreover, voters have had little opportunity to learn about the existence of the reasonable impediment option. (*See* ECF No. 91-12 ¶ 14 (explaining that many individuals "do not understand what constitutes a 'reasonable impediment' or what it takes to present evidence that will satisfy this Voter ID exception").) For example, while the SBOE has conducted several county "forums" to educate potential voters about the features of S.B. 824, including the reasonable impediment exception, Plaintiffs report that the forums "have been poorly publicized, sparsely attended, and confusing." (*See* ECF No. 91 at 34.) With the start of the primaries just two months away, the state does not have time to adequately train poll workers, virtually ensuring that some registrants—including a disproportionate number of minority voters—will be prevented from voting because they lack proper photo identification and cannot navigate the reasonable impediment process.

Further, the Court is concerned about the interaction between S.B. 824's reasonable impediment provision and its provision expanding the grounds for ballot challenges. As Plaintiffs' expert James Leloudis explains, the threat of voter harassment looms large—for example, in 2012, "self-appointed watchdogs" used a similar provision to petition "to have more than 500 voters, most of them people of color, removed from the registration rolls" in Wake County. (ECF No. 91-2 at 63–64.) S.B. 824 invites *any voter* of the county to "enter the voting enclosure" and proclaim that another voter "[did] not present photo identification in accordance with [S.B. 824]." *See* N.C. Gen. Stat. § 163-87. Voters exercising the reasonable impediment exception, who, by definition, do

not present ID, could be exposed to, at best, disruption and, at worst, intimidation.

Thus, the evidence suggests that S.B. 824 is likely to have a racially disproportionate impact in North Carolina by preventing some voters of color from casting their ballots when they get to the polls. However, a second potential impact—harder to predict, but potentially more significant—should not be overlooked: dissuasion. Plaintiffs have submitted evidence indicating that some voters will be deterred from even *attempting* to vote because they lack, or believe they lack, acceptable identification. (*See, e.g.,* ECF No. 91-4 at 36 (citing a Texas study which showed that "confusion about [that state's voter-ID] law, due in part to insufficient public education, deterred participation more than the actual law did").) Community organizers like Kate Fellman report that the frequent alterations to North Carolina's voting requirements over the past decade "have bred distrust, mistrust and apathy" among eligible minority voters:

> We have heard from people who were turned away from the polls in the 2016 Primary, for example, who have decided they will not vote again. We are aware of people who have waited in line to get a photo ID at the DMV for more than 3 hours, and then gave up. We hear from frustrated citizens regularly 'my vote doesn't matter' and 'I don't vote.' They describe being fed up with changing laws and perceive attempts to curb participation as directed at them.

(ECF No. 91-13 ¶ 43.) While assigning an exact number to phenomena like voter "apathy" and "distrust" can be challenging, a recent study by Stanford University researchers found that, in the aftermath of *McCrory*, North Carolina voters without proper identification remained 2.6% less likely to turn out in the 2016 general election—despite the fact that ID was no longer required to vote—and that these dissuaded voters were disproportionately people of color. *See* Justin Grimmer and Jesse Yoder, *The Durable Deterrent Effects of Strict Photo Identification Laws* 2, 4 (July 1, 2019). The results of that study also call into question the potential effectiveness of the reasonable impediment option; absent a

robust educational effort, voters without acceptable ID may assume that they are unable to vote and stay home.

**\*17** In sum, Plaintiffs are likely to succeed in showing that S.B. 824 will "bear more heavily on one race than another" in two distinct ways. If the State's experience administering the 2016 primaries is any indication, S.B. 824 is likely to prevent at least some individuals from casting their votes once they arrive at their polling station. Disparate ID possession rates mean that minority voters will bear this effect more severely than their white counterparts. In addition, a larger number of North Carolinians—including a disproportionate number of African American and Hispanic citizens—could be deterred from voting or registering to vote because they lack, or believe they lack, acceptable identification and remain confused by or uninformed about S.B. 824's exceptions. These effects suffice to establish disproportionate impact under *Arlington Heights* and weigh in favor of a finding of discriminatory purpose.

5. <u>Conclusion</u>

Having considered each of the *Arlington Heights* factors, the Court agrees with Plaintiffs that it is likely S.B. 824 was motivated, at least in part, by racially discriminatory intent. This conclusion is not reached lightly. However, Plaintiffs "need not show that discriminatory purpose was the 'sole[ ]' or even a 'primary' motive for the legislation," but, rather, "just that it was '*a* motivating factor.' " *McCrory*, 831 F.3d at 220 (quoting *Arlington Heights*, 429 U.S. at 265–66, 97 S.Ct. 555). The preliminary evidence demonstrates a clear likelihood that Plaintiffs will establish that discrimination was behind the law: S.B. 824 was enacted against a backdrop of recurring state-sanctioned racial discrimination and voter suppression efforts—both in the far and more recent past—and the state's polarized electorate presents the opportunity to exploit race for partisan gain. While the sequence of events surrounding S.B. 824's enactment were procedurally unobjectionable, the bill's temporal proximity to H.B. 589, the fact that many of the same legislators shepherded and voted for both laws, and the potential that, were it not for unconstitutionally gerrymandered maps, the legislature would not have had the supermajorities necessary to place a constitutional amendment before voters or override the governor's veto, indicate that something was amiss. The legislative history, rife with intransigent statements from S.B. 824's supporters, confirms that, rather than trying to cleanse the discriminatory taint which had imbued H.B. 589, the legislature sought ways to circumvent state and federal courts

and further entrench itself. Further, S.B. 824 is likely to have a disparate impact on minority voters, even if the "free ID" and reasonable impediment provisions mean that its impact is substantially lessened. In sum, the totality of the relevant facts at this stage demonstrate that discriminatory intent was a motivating factor in the enactment of S.B. 824. While this Court does not agree with Plaintiffs' characterization of S.B. 824 as a "barely disguised duplicate of H.B. 589," (ECF No. 91 at 10), serious concerns about its constitutionality remain.

**B. Proffered Non-Racial Motivations**

Because Plaintiffs are likely to establish that race was a factor motivating enactment of the challenged provisions of S.B. 824, the burden now "shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter*, 471 U.S. at 228, 105 S.Ct. 1916; *Arlington Heights*, 429 U.S. at 270 n.21, 97 S.Ct. 555. The state's proffered non-racial interests must be scrutinized intensely; because "racial discrimination is not just another competing consideration," a rational-basis-like search for arbitrariness will not suffice. *See Arlington Heights*, 429 U.S. at 265–66, 97 S.Ct. 555. In other words, "[w]hen there is proof that a discriminatory purpose has been a motivating factor in the decision," the typical judicial deference to stated legislative interests is "no longer justified." *Id.* Instead, the Court must consider not just whether a legitimate interest is present, but also "the *substantiality* of the state's proffered non-racial interest and how well the law furthers that interest." *See McCrory*, 831 F.3d at 233–34 (emphasis added).

*18 Defendants contend that three non-racial interests motivated the passage of S.B 824: (1) the state's interest in combatting voter fraud and inspiring confidence in elections; (2) the obligation to fulfill North Carolina's constitutional mandate requiring voter ID; and (3) the related goal of pursuing these interests in a fashion likely to survive judicial scrutiny. Again, the Court's task in considering these interests is to discern whether S.B. 824 was enacted "because of," rather than "in spite of" its discriminatory impact. *McCrory*, 831 F.3d at 220 (quoting *Pers. Adm'r of Mass.*, 442 U.S. at 279, 99 S.Ct. 2282).

### 1. Combating Voter Fraud and Inspiring Confidence in Elections

As established in *Crawford*, states have a legitimate interest in "protecting the integrity and reliability of the electoral process." *See* 553 U.S. at 191, 128 S.Ct. 1610 (plurality opinion). In service of this broad interest, states may pursue creative means of "deterring and detecting voter fraud," modernizing elections, and "safeguarding voter confidence." *Id.* This includes the adoption of photo ID requirements for voting, even when "there [is] limited evidence" of the kind of voter fraud that voter ID is best-suited to prevent. *See Lee*, 843 F.3d at 606 n.*.

Defendants and *amici* strongly imply that *Crawford* gave the states carte-blanche to pass voter-ID laws under any circumstances. (*See, e.g.*, ECF Nos. 97 at 17, 21; 117 at 24–25.) They are mistaken. As the Fourth Circuit explained in *McCrory*, although North Carolina has a legitimate interest in combating voter fraud—and may adopt a voter-ID requirement to serve that interest—the state may not pretextually employ said interest to mask invidious aims. *See McCrory*, 831 F.3d at 235 (distinguishing the deference required under the "*Anderson–Burdick*" balancing employed in *Crawford* from the more piercing scrutiny required in cases in which a law was motivated, at least in part, by discriminatory intent). After all, a hallmark of equal protection is that an ordinarily lawful action may become constitutionally rotten when motivated by discriminatory intent. *See Arlington Heights*, 429 U.S. at 266 n.14, 97 S.Ct. 555 ("A single invidiously discriminatory governmental act ... would not necessarily be immunized by the absence of such discrimination in the making of other comparable decisions."); *City of Richmond v. United States*, 422 U.S. 358, 379, 95 S.Ct. 2296, 45 L.Ed.2d 245 (1975) ("[A]cts generally lawful may become unlawful when done to accomplish an unlawful end.").

When it passed H.B. 589 in 2013, the legislature "stated that it sought to combat voter fraud and promote public confidence in the electoral system." *See McCrory*, 831 F.3d at 235 (citing 2013 N.C. Sess. Laws 381). However, the Fourth Circuit determined that these otherwise valid interests —and the voter-ID provisions enacted to serve them—were pretextual "cures for problems that did not exist." *Id.* at 214, 235. H.B. 589's photo-ID requirement was "at once too narrow and too broad." *Id.* at 235 (quoting *Romer v. Evans*, 517 U.S. 620, 633, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996)). On the one hand, the law narrowly applied only to in-person voting (for which no evidence of fraud existed) but *not* to absentee voting (for which some evidence of alleged fraud *did* exist). *Id.* On the other, the law contained "seemingly irrational restrictions unrelated to the goal of combatting fraud," most notably the exclusion of "all forms of state-

issued ID disproportionately held by African Americans." *Id.* at 236. Taken together, these provisions "elevate[d] form over function," which suggested that race, rather than concern about fraud, motivated the law's enactment. *See id.* at 236.

**\*19** As with H.B. 589, the drafters of S.B. 824 cited concerns about voter fraud and diminished public confidence as reasons to implement a photo voter-ID requirement. *See supra* Section II.A.3. However, Plaintiffs' experts attest that, three years after *McCrory* was decided, there is still "virtually no evidence that would suggest voters are systematically intentionally corrupting the electoral process, either nationally or in North Carolina." (*See* ECF No. 91-10 at 38.) Defendants do not directly contest this evidence. However, the Court must acknowledge that, if H.B. 589 was "too narrow and too broad," S.B. 824 is a little less narrow and a little less broad. Unlike its predecessor, S.B. 824 "requires absentee voters to present similar types of photo IDs or to execute the same reasonable impediment declaration as in-person voters," thereby imposing its allegedly anti-fraud provisions across the board. (ECF No. 97 at 16 (citing 2018 N.C. Sess. Laws 114 §§ 1.2.(d), (e); 08 N.C. Admin. Code 17.0109).) Likewise, the inclusion of some school and government IDs and the availability of no-charge IDs at least partially addresses overbreadth concerns. Nevertheless, the continued exclusion of public-assistance and federal employee photo IDs, along with the piecemeal acceptance of state and local government IDs, invites skepticism. (*See* ECF No. 97-16 at 667 (statement of Rep. Jackson) ("A Federal ID can get you in the Pentagon, but not into a North Carolina voting booth.").) Thus, while the fraud and public confidence justifications are legitimate in theory, they remain weak in fact.

### 2. Implementing the Photo-ID Constitutional Amendment

Next, Defendants and *amici* submit that the legislature was motivated by "a vital interest in addition to those accepted in *Crawford*: an interest in fulfilling the mandate of the State Constitution to pass a voter ID law." [23] (*See* ECF Nos. 97 at 17; 117 at 25–26.) The voter-ID amendment does state that the legislature "shall enact general laws governing the requirements of such photographic identification." N.C. Const. art. VI §§ 2(4), 3(2). However, nothing in the amendment's text mandates the enactment of a photo-ID scheme which violates the federal Constitution or the VRA. In fact, the limited text of the amendment leaves room for implementing legislation "*which may include exceptions,*"

*see id.* (emphasis added)—an invitation to craft a more nuanced voter-ID law which, unlike H.B. 589, accounts for disparate ID possession rates, North Carolina's history, and the like.

Further, the origin of the amendment itself cannot be ignored. The bill's proponents framed themselves as implementing a freshly conceived public mandate; faithful servants whose hands were tied. However, it was S.B. 824's architects who conceived of the amendment and placed it on the ballot in the first place—not to give the people of North Carolina the chance to ratify or reject specific voter-ID requirements, but to ostensibly give themselves greater leeway in enacting their desired bill. *See supra* Section II.A.3. Simply put, the argument that the legislature "had to" enact S.B. 824 in order fulfill a constitutional mandate is unavailing. While the legislature may have had to pass some form of photo voter-ID law, it did not have to enact one which suffers from impermissible defects.

### 3. Withstanding Judicial Scrutiny

Related to the two interests discussed above, Defendants appear to argue that a valid state interest lies in enacting legislation patterned after other laws which have survived judicial scrutiny. (ECF No. 21.) In passing S.B. 824, they contend, "the legislature largely sought to emulate South Carolina's photographic voter-ID law, which has survived judicial scrutiny and has been described as lenient." (*Id.*) Similarly, Defendants point to the Fourth Circuit's decision in *Lee* upholding Virginia's voter-ID law; a law which, in their estimation, is "even more burdensome" than S.B. 824 because it lacks a reasonable impediment provision. (*Id.* at 32.) The argument appears to be that, rather than simply re-enacting H.B. 589 to fulfill the voter-ID amendment's mandate, the legislature chose instead to assiduously follow pre-approved templates, thereby distancing itself from any lingering discriminatory motives.

**\*20** "It is one of the happy incidents of the federal system" that individual states may serve as "laborator[ies]" of democracy. *See New State Ice Co. v. Liebmann*, 285 U.S. 262, 311, 52 S.Ct. 371, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting). Compared to some other states, North Carolina's experience with voter ID is relatively new. It makes sense, therefore, that the legislature would look to those states which have, through years of practical administration and judicial critique, developed ID laws which pass muster. Given the

clear failings of H.B. 589, the legislature must be commended for trying to emulate states that, based on their specific circumstances, appear to have gotten it right.

However, as with the interests discussed in *Crawford*, the evidence that discrimination was a motivating factor in this case means that any similarities between S.B. 824 and the voter-ID laws of South Carolina and Virginia are of limited value. As the Court's analysis above makes clear, there is no such thing as 'one-size-fits-all' when it comes to complying with the mandates of the Fourteenth and Fifteenth Amendments. In *Lee*, the Fourth Circuit acknowledged this reality when it concluded that the facts surrounding the passage of Virginia's voter-ID law were "in no way like those found in" *McCrory*. *See* 843 F.3d at 604. In contrast to the process which produced H.B. 589, Virginia's legislative sequence "contained no events that would 'spark suspicion' "; the Virginia legislature "did not call for, nor did it have, the racial data used in the North Carolina process"; and, perhaps most notably, Virginia has made "a significant correction" from its past "history of discrimination" and is now on "a trajectory toward greater inclusion." *Id.* at 597, 604. These key distinctions produced different outcomes in *McCrory* and *Lee*—the former concluding that North Carolina had acted with discriminatory intent, the latter concluding that Virginia had not—despite the fact that certain terms of the two voter-ID laws may be similar.[24]

Outside of this Circuit, Defendants direct the court to *South Carolina v. United States*, in which a three-judge panel of the U.S. District Court for the District of Columbia granted § 5 pre-clearance to South Carolina's 2011 voter-ID law. *See* 898 F. Supp. 2d 30, 52 (D.D.C. 2012). S.B. 824 and South Carolina's ID law are, in certain respects, substantively similar: for instance, "[b]oth states have enabled the issuance of free voter IDs," and the laws' reasonable impediment provisions are "nearly identical." (ECF No. 97 at 21–22 (citing 2018 N.C. Sess. Laws 144 §§ 1.1. (a), 1.3.(a); S.C. Code Ann. § 7-5-675).) Despite these similarities, the record before the court in *South Carolina* apparently did not suggest—as the preliminary record here suggests—that the state enacted its photo voter-ID law, at least in part, with discriminatory purpose. *See* 898 F. Supp. 2d at 45. Both laws are facially neutral, have stated nondiscriminatory justifications in their texts, accept numerous forms of ID, and contain "expansive" reasonable impediment provisions which enable voting without ID. Beyond that, however, the laws' qualities diverge: the *South Carolina* court concluded, outright, that South Carolina's

law "has no discriminatory retrogressive effects," *id.* at 45–46; here, Plaintiffs have produced evidence suggesting that S.B. 824 *will* have a discriminatory impact. The legislative history of South Carolina's law was mildly described as "sometimes rancorous," *id.* at 45; here, lawmakers appear to have been dead set on circumventing *McCrory* and passing a bill which incorporated the "same ideas" as H.B. 589, despite vehement opposition from the opposition party. And whereas South Carolina's legislators worked together, in a genuinely bipartisan fashion, to design from scratch provisions which would "alleviate the burdens on voters without photo IDs," *id.* at 44, 45 n.10, the sequence of events leading up to the passage of S.B. 824 reflects an effort by the majority party to do as little as possible and still withstand judicial review. Thus, the evidence in this case contains strong signs of discriminatory intent, whereas it appears that the evidence in *South Carolina* did not.

### 4. Conclusion

**\*21** In sum, Defendants have failed at this stage to demonstrate that S.B. 824 "would have been enacted without" race as a motivating factor. *See McCrory*, 831 F.3d at 221. As in *McCrory*, the continuing lack of evidence of in-person voter fraud in North Carolina casts doubt on the sincerity (if not the facial legitimacy) of the fraud and confidence justifications. The state's constitutional amendment requiring photo identification in no way absolves discriminatory actors or breaks the chain of purpose connecting S.B. 824 to its predecessor. And the effort to model S.B. 824 after South Carolina and Virginia law will only get the state so far, given the localized, "sensitive inquiry into ... circumstantial and direct evidence of intent" required by *Arlington Heights*. *See* 429 U.S. at 266, 97 S.Ct. 555.

At this stage, therefore, the Court concludes that Plaintiffs have demonstrated a clear likelihood of success on the merits of their discriminatory intent claims for at least the voter-ID and ballot-challenge provisions of S.B. 824. However, as to the provisions increasing the number of at-large poll observers appointed by each party, *see* 2018 N.C. Sess. Laws 144 § 3.3, the Court is not convinced that success on the merits is likely. Those provisions, which falter at the first step of the preliminary injunction analysis, will be allowed to go into effect.

### C. The VRA's Section 2 Results Standard

In addition to alleging that the challenged provisions of S.B. 824 were enacted with discriminatory intent, Plaintiffs also argue that the law violates the VRA's § 2 "results" standard. (ECF No. 91 at 36–43.) Section 2 forbids any "standard, practice, or procedure" which "results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color."[25] 52 U.S.C. § 10301(a). In contrast to claims brought directly pursuant to the Fourteenth or Fifteenth Amendment, which require proof of discriminatory intent, a § 2 violation may "be established by proof of discriminatory *results alone*." *LWV*, 769 F.3d at 238 (quoting *Chisom v. Roemer*, 501 U.S. 380, 404, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991)) (emphasis added).

The Fourth Circuit has recently intimated that, to succeed on a § 2 results-only claim, a plaintiff must "make a greater showing of disproportionate impact" than is required to evidence discriminatory intent under an *Arlington Heights* analysis. *See McCrory*, 831 F.3d at 231 n.8. "Otherwise, plaintiffs could prevail in any and every case in which they proved any impact." *Id.* The Court accepts this distinction, as it must. However, the difference in magnitude between the impact required to demonstrate evidence of discriminatory intent under *Arlington Heights* and the "greater showing" required to succeed on a § 2 results claim is poorly defined. In *Lee*, for example, the Fourth Circuit concluded "that § 2 does not sweep away all election rules that result in a disparity in the convenience of voting." 843 F.3d at 601. However, other cases, including from the Supreme Court, have held that the VRA "should be interpreted in a manner that provides the 'broadest possible scope' in combating racial discrimination," *Chisom*, 501 U.S. at 403, 111 S.Ct. 2354, and that "what matters for purposes of Section 2 is not how many minority voters are being denied equal electoral opportunities but simply that 'any' minority voter is being denied equal electoral opportunities," *LWV*, 769 F.3d at 244. In short, it is not entirely clear when, exactly, disparate burdens become severe enough to amount to a "denial or abridgment of the right ... to vote." 52 U.S.C. § 10301(a).

**\*22** What *is* clear is that a § 2 results analysis requires "an intensely local appraisal." *See Thornburg v. Gingles*, 478 U.S. 30, 78, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986); *LWV*, 769 F.3d at 243 (concluding that the district court's failure to "understand the local nature of Section 2" amounted to error). As with discriminatory intent claims, a § 2 results claim is assessed under "the totality of the circumstances"— rather than examine the challenged government action in the abstract, courts must consider whether an "electoral

law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [non-white] and white voters to elect their preferred representatives." *See Gingles*, 478 U.S. at 47, 106 S.Ct. 2752; 52 U.S.C. § 10301(b). The Fourth Circuit has divided this holistic inquiry into a two-part test:

> First, the challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

> Second, that burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.

*See LWV*, 769 F.3d at 240 (internal quotation marks and citations omitted). The Court's determination under this test is guided by certain factors, detailed in the VRA's legislative history, "which typically may be relevant" (the "Senate Factors").[26] *Gingles*, 478 U.S. at 44, 106 S.Ct. 2752. However, "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Id.* at 45, 106 S.Ct. 2752 (internal citation omitted).

According to Plaintiffs, S.B. 824's ID requirements amount to "a textbook Section 2 violation" because the disparate impacts described above, *see supra* Section II.A.4, are "in part caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class." (ECF No. 91 at 36–37 (quoting *LWV*, 769 F.3d at 245).) In response, Defendants continue to argue that S.B. 824's "free" ID and reasonable impediment provisions ameliorate any substantial burdens on minority voting that the law might otherwise cause. (*See* ECF 97 at 31–32.) Defendants further point out that courts in similar cases— most notably *Lee* and *South Carolina*—have upheld "even more burdensome" ID regimes as valid under the VRA. (*See id.* at 32.) Because a law's validity under the § 2 results standard is judged by the "totality of the circumstances," those cases are persuasive, rather than binding. However, they are especially persuasive here, because they offer examples of voter-ID laws which, under the relevant circumstances, courts concluded did not rise to the level of "den[ying] or abridg[ing]" the right to vote.

**\*23** As a reminder, the preliminary evidence on disparate burden suggests the following: (1) African American and Hispanic voters are less likely than white voters to currently possess an acceptable form of ID under S.B. 824; (2) S.B. 824 makes "free" voter IDs available, though lack of access to transportation and other socioeconomic factors could, in reality, make obtaining these IDs costly for a disproportionate number of minority voters; (3) voters without an ID may still vote using the law's reasonable impediment exception, though the state's experience in the 2016 primary suggests that, even then, some voters may still be improperly disenfranchised; and (4) a disproportionate number of minority voters could be deterred or dissuaded from voting because they lack, or believe they lack, acceptable ID and are confused by or unaware of the reasonable impediment option.

The Court has already determined that these disparate effects may be properly considered as evidence of discriminatory intent under *Arlington Heights*. In *Lee*, however, the Fourth Circuit rejected a § 2 impact claim bearing stark resemblance to Plaintiffs' claim here—that "because members of the protected class are less likely to possess photo identification, [Virginia's photo ID] requirement imposes an unacceptable, disparate burden that has the effect of denying African Americans and Latinos an equal opportunity to vote." [27] 843 F.3d at 599. Like S.B. 824, Virginia's law makes no-charge IDs available upon request and allows voters without ID to cast provisional ballots, which they can cure by later presenting an ID. *Id.* at 600. These ameliorative provisions, which, technically speaking, give "every registered voter in Virginia ... the full ability to vote when election day arrives," convinced both the district court and the Fourth Circuit that the state's photo-ID requirement "does not diminish the right of any member of the protected class to have an equal opportunity to participate in the political process and thus does not violate § 2." *Id.* In other words, Virginia's law imposes "disparate inconveniences," but it would be an "unjustified leap" to suggest that those inconveniences amounted to "the denial or abridgment of the right to vote." *Id.* at 600–01.

In *South Carolina*, the U.S. District Court for the District of Columbia similarly found that any potentially disparate effects caused by the state's photo ID law were sufficiently alleviated by another mechanism shared by S.B. 824: the reasonable impediment provision. In that court's view, § 5 pre-clearance was warranted because South Carolina's "sweeping" reasonable impediment provision— nearly identical in structure and operation to S.B. 824's

—"eliminates any disproportionate effect or material burden that [the] voter ID law otherwise might have caused." *South Carolina*, 898 F. Supp. 2d at 40. To be sure, the evidence in this case suggests that S.B. 824's reasonable impediment provision may not be as foolproof as Defendants make it out to be. Nevertheless, the *South Carolina* court's assessment is instructive.

Assuming for the time being that the disparate burdens brought on by S.B. 824 *do* amount to the "greater showing" necessary to prove a § 2 results-only claim, the Court must also consider whether those burdens are, at least in part, "caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class." *LWV*, 769 F.3d at 240 (internal quotation marks and citations omitted). On this point, there is no doubt—review of the Senate Factors indisputably illustrates that S.B. 824's disparate burdens stem from deeply rooted social and historical conditions: The state has a long and unfortunate history of voting-related discrimination. Voting has been—and still is—racially polarized. Minorities hold a small share of the state's public offices. Black North Carolinians are "disproportionately likely to move, be poor, less educated, have less access to transportation, and experience poor health," *McCrory*, 831 F.3d at 233 (internal citations omitted), and Hispanics in the state are less wealthy, educated, and healthy than their white counterparts, (ECF No. 91-4 at 16–18). And, as explained above, the "policy underlying the State's ... use of the contested practice or structure"—deterring voter fraud—"is tenuous" despite its facial legitimacy. *See Gingles*, 478 U.S. at 45, 106 S.Ct. 2752. In sum, were Plaintiffs to successfully demonstrate that S.B. 824 results in "less opportunity" for minority voters "to participate in the political process and to elect representatives of their choice," *LWV*, 769 F.3d at 240, they would be likely to prevail on their § 2 results claim.

**\*24** At this stage, however, the Court concludes that Plaintiffs have not demonstrated a likelihood of success under § 2's results standard sufficient to independently warrant a preliminary injunction. While plaintiffs seeking preliminary injunctions "need not show a certainty of success," *see Pashby*, 709 F.3d at 321, the outcomes in *Lee* and *South Carolina*, coupled with the Fourth Circuit's statements about the different impact showings required for § 2 results claims versus discriminatory intent claims, suggest that the bill's anticipated impact, on its own, is not enough to invalidate S.B. 824—at least not according to the evidence currently in the record. This is not to say, of course, that Plaintiffs will not

be able to succeed on their § 2 results claim at trial. For the purposes of a preliminary injunction, however, their results-only claim falls short.

### D. Remaining Preliminary Injunction Factors

As Plaintiffs have shown a likelihood of success on the merits for at least some of their claims—that S.B. 824's voter-ID and ballot-challenge provisions were enacted with discriminatory intent—the Court must now consider each of the remaining preliminary injunction elements: irreparable harm, the balance of equities, and the public interest. *See Winter*, 555 U.S. at 20, 129 S.Ct. 365.

#### 1. Irreparable Harm

Plaintiffs must "make a clear showing that [they are] likely to be irreparably harmed absent preliminary relief." *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 347 (4th Cir. 2009). To demonstrate irreparable harm, a party must establish that (1) the harm is "certain and great, actual and not theoretical, and so imminen[t] that there is a clear and present need for equitable relief"; and (2) that, once incurred, the threatened harm would be "beyond remediation." *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (internal quotation omitted) (alteration in original) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). Further, an injury is typically deemed irreparable if monetary damages are inadequate or difficult to ascertain. *See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994), *abrogated on other grounds by Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. at 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).

By their very nature, laws impacting the right to vote create the potential for irreparable harm; once an election occurs, "there can be no do-over and no redress." *LWV*, 769 F.3d at 247. For this reason, "[c]ourts routinely deem restrictions on fundamental voting rights irreparable injury." *Id.* (collecting cases). Organizations with core voter-advocacy missions, like Plaintiffs in this case, are irreparably harmed when "the defendant's actions 'perceptibly impair[ ]' the organization's programs, making it more difficult to carry out its mission." *See, e.g., Action NC*, 216 F. Supp. at 642 (quoting *Lane v. Holder*, 703 F.3d 668, 674–75 (4th Cir. 2012)); *Newby*, 838 F.3d at 9 (holding that plaintiffs suffered an irreparable harm when newly enacted barriers to registering voters "ma[de]

it more difficult for [them] to accomplish their primary mission of registering voters"). Under this 'mission' theory, an organizational plaintiff satisfies its burden of showing a likelihood of suffering irreparable harm when it alleges that it must divert resources away from its other initiatives to respond to the government's action. *See Action NC*, 216 F. Supp. 3d at 642.

A voting-rights organization is also irreparably harmed when the right to vote is wrongfully denied or abridged—whether belonging to its membership or the electorate at large. *See Common Cause Georgia v. Kemp*, 347 F. Supp. 3d 1270, 1295 (N.D. Ga. 2018) (holding that the harm plaintiff suffered to its organizational interest was "coterminous" with the harm its members would suffer if voting was made more difficult); *Common Cause Ind. v. Lawson*, 327 F. Supp. 3d 1139, 1154 (S.D. Ind. 2018) (holding that an organizational plaintiff would suffer an irreparable harm if voters were wrongfully disenfranchised).

**\*25** Under these principles, Plaintiffs have demonstrated a clear likelihood of irreparable harm. First, Plaintiffs have alleged that they have diverted resources away from their other voter-education efforts to respond to S.B. 824, that they will need to continue doing so if the law is not enjoined, and that such diversions compromise the overall mission of the NAACP. (*See* ECF No. 91-8 ¶¶ 56, 58.) Second, if S.B. 824 has the effect that the preliminary evidence suggests it will, the upcoming elections will be distorted in ways that cannot be undone, wrongfully depriving at least some North Carolinians of the right to vote. Without question, therefore, Plaintiffs have made a clear showing that they and the voters they represent will likely suffer irreparable harm in the absence of an injunction, and that such injury is "neither remote nor speculative, but actual and imminent." *See In re Microsoft*, 333 F.3d at 530 (internal citation and emphasis omitted).

#### 2. Balance of the Equities

The balance of the equities likewise tips in Plaintiffs' favor. As discussed above, Plaintiffs have demonstrated that, if allowed to go into effect, S.B. 824 would likely work irreparable harm against them and, more broadly, minority voters in North Carolina. Against this grave risk, Defendants first offer platitudes: "[a]ny time a State is enjoined by a Court from effectuating statutes enacted by representatives of its people," they argue, "it suffers a form of irreparable injury." (ECF

No. 97 at 42 (quoting *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351, 98 S.Ct. 359, 54 L.Ed.2d 439 (1977) (Rehnquist, J., in chambers)).) It is true, of course, that the state will suffer this kind of harm whenever an injunction is issued against one of its laws. However, it is also an essential feature of our federal system that states must, when necessary, endure the irreparable injury of having unconstitutional enactments enjoined. *See United States v. City of Cambridge*, 799 F.2d 137, 140 (4th Cir. 1986) ("[D]iscriminatory procedures constitute the kind of serious violation of the Constitution and the Voting Rights Act for which courts have granted immediate relief.")

The Court must also consider the steps that Defendants have already taken towards implementing S.B. 824. By its terms, S.B. 824 requires the SBOE to "establish an aggressive voter education program" aimed at "disseminat[ing] information in a way that would reasonably inform the public" about the bill's ID requirements and the options for voting without identification. *See* 2018 N.C. Sess. Laws 144 § 1.5.(a). However, the state's efforts to fulfill this mandate have so far been lackluster. After the legislature decided to delay implementation of S.B. 824's ID requirements until the 2020 elections, the SBOE virtually halted its efforts to train poll workers and educate the public about the new law. *See* 2019 N.C. Sess. Laws 4; (ECF No. 97-9 at 7–8 (showing that trainings have not been conducted since August, 2019)). According to the record, the state *has* attempted to reach individual voters directly through mass mailings, as required under S.B. 824 § 1.5.(a).[28] (*See* ECF Nos. 97-9 at 8 (describing a 700,000-piece mailing delivered "to every registered voter whom the State Board determined may not possess a DMV-issued ID that would be valid for voting" in September 2019), 9 (anticipating that the SBOE "will also be mailing a notification of the photo ID requirements for the 2020 elections to every residential address in the state twice before the end of [2019]").) Beyond this, however, the record is devoid of evidence that the state has undertaken other crucial implementation efforts *required by S.B. 824*, namely: (a) coordinating with local media outlets to spread the word about ID requirements; (b) automatically mailing new, DMV-issued IDs to eligible voters whose driver's licenses have been seized; and (c) drafting the RID form which will be used in the upcoming primaries. *See* 2018 N.C. Sess. Laws 144 §§ 1.2.(a), 1.5.(a). Thus, while the state has committed some resources to S.B. 824's implementation, the bulk of the work still remains undone. Accordingly, the balance of the equities weighs in Plaintiffs' favor.

### 3. Public Interest

**\*26** Finally, there is the question of whether a preliminary injunction would serve the public interest. The public interest "favors permitting as many qualified voters to vote as possible." *LWV*, 769 F.3d at 247 (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012)). For electoral integrity is enhanced, not diminished, when all eligible voters are allowed to exercise their right to vote free from interference and burden unnecessarily imposed by others. The public interest is also served by "upholding constitutional rights." *See id.* at 248 (quoting *Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003)). However, in the election context, stability and consistency are also virtues. (*See* ECF No. 97-32 at 4 ("If [voters are] receiving ... information that a photo ID is required and then the law is struck down as unconstitutional the next day, then you have to unwind all of that information.").) With the 2020 primaries on the horizon, there is some risk that a preliminary injunction could add to confusion, thereby threatening an effective roll-out should the law later be declared valid. However, the far greater risk is that a law enacted with discriminatory intent, the effects of which are likely to be disproportionately borne by minority voters, be allowed to operate.

The Court therefore determines that a preliminary injunction is in the public interest.

## V. CONCLUSION AND REMEDIES

Based on the above discussion, the Court concludes the following: Plaintiffs have satisfied each element required to support the issuance of a preliminary injunction with respect to their claims that S.B. 824's voter-ID (both in-person and absentee) and ballot-challenge provisions were impermissibly motivated, at least in part, by discriminatory intent. Those provisions will be enjoined pending trial. In contrast, the evidence in the record does not sufficiently demonstrate that S.B. 824's provision expanding the number of at-large poll workers allotted to both political parties warrants an injunction at this time. Finally, because Plaintiffs have not yet demonstrated that they would be likely to succeed on the merits of their § 2 results-only claims, no injunction will be issued on that independent basis.

A federal district court may fashion injunctive relief to fit the particular facts and circumstances of the case before it. *See Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1308

(4th Cir. 1992) (citing *Lemon v. Kurtzman*, 411 U.S. 192, 200, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973)). In exercise of that discretion, the Court will tailor the terms of its preliminary injunction to ensure, as much as reasonably possible, that election officials and voters are aware that S.B. 824's ID and ballot-challenge provisions have been enjoined, and that no voter ID will be required in the upcoming election cycle unless otherwise ordered by the Court.

To that end, the Court enters the following:

### ORDER AND PRELIMINARY INJUNCTION

IT IS ORDERED that Plaintiffs' Motion for Preliminary Injunction, (ECF No. 72), is hereby GRANTED IN PART AND DENIED IN PART to the extent set forth herein.

IT IS FURTHER ORDERED that Defendants and their officers, agents, servants, employees, and those persons in active concert or participation with them, are HEREBY ENJOINED AND RESTRAINED from implementing any of S.B. 824's voter-ID requirements and ballot-challenge provisions with respect to any election, until otherwise ordered by this Court.

IT IS FURTHER ORDERED that Defendants and their officers, agents, servants, employees, and attorneys, and

those persons in active concert or participation with them, shall take all steps necessary to halt any mailings and other communications directed to the public that may be in production, but which have not yet been sent out, which state that photo ID will be required for 2020 elections, until otherwise ordered by this Court.

IT IS FURTHER ORDERED that Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them shall work with local media, county boards of elections, and voter-education groups to take all necessary and reasonable steps to inform voters of this Injunction and, specifically, inform voters that no photo ID will be required to vote, until otherwise ordered by this Court.

**\*27** IT IS FURTHER ORDERED that Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them shall take all reasonable and necessary steps to ensure statewide compliance with this Court's Opinion, Order, and Preliminary Injunction.

### All Citations

--- F.Supp.3d ----, 2019 WL 7372980

### Footnotes

1    As amended, the North Carolina State Constitution provides as follows:
     Voters offering to vote in person shall present photographic identification before voting. The General Assembly shall enact general laws governing the requirements of such photographic identification, which may include exceptions.
     N.C. Const. art. VI, §§ 2(4), 3(2).
2    Broader discussion of the legislative history of S.B. 824 will occur later in this Opinion.
3    Plaintiffs have organizational standing to bring this suit. "A plaintiff may establish organizational standing 'when it seeks redress for an injury suffered by the organization itself.' " *Guilford Coll. v. McAleenan*, 389 F. Supp. 3d 377, 388 (M.D.N.C. 2019) (quoting *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458 (4th Cir. 2005)). An organization suffers such an injury "when the plaintiff alleges that 'a defendant's practices have hampered an organization's stated objectives causing the organization to divert its resources as a result.' " *Id.* (quoting *Action NC v. Strach*, 216 F. Supp. 3d 597, 616 (M.D.N.C. 2016)). Here, Plaintiffs have adequately alleged that they will need to divert resources away from their planned voter-engagement efforts to respond to S.B. 824's requirements. (ECF No. 91-8 ¶¶ 53, 56, 58.) They have further alleged that this diversion of resources will detract from their fundamental mission, which includes advancing the political status of minority

    groups, to the detriment of all Plaintiffs. (*See id.*; ECF No. 1 ¶ 14.) These allegations suffice to establish organizational standing.

4    The final pre-*Shelby County* version of H.B. 589 permitted voters to use a much wider array of photo identification, including, but not limited to: (a) community college IDs; (b) public-assistance IDs; and (c) federal, state, and local government IDs. These forms of identification were stripped after *Shelby County* and remain excluded or severely limited by S.B. 824. *See* 2013 H.B. 589 (fifth ed.) § 4; (ECF No. 91-1 at 44–45, tbl. 8).

5    Data from the 2018 state constitutional referendum show that 66% of whites supported the voter-ID amendment, compared to just 35% of non-whites. (*See* ECF No. 91-1 at 65.)

6    In September 2019, a state court found that legislative leaders, through attorneys working on their behalf, had misled the three-judge district court in *Covington v. North Carolina* about their reliance on racial data in drafting legislative maps. *See Common Cause v. Lewis*, No. 18 CVS 014001, 2019 WL 4569584, at *105 (N.C. Super. Ct. Sept. 3, 2019) (explaining that the court was "troubled by representations made by [legislative leaders] ... to the *Covington* Court" which were "highly improbable").

7    The Fourteenth and Fifteenth Amendments "prohibit racial discrimination in the regulation of elections." *McCrory*, 831 F.3d at 215. The Fourteenth Amendment commands that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Fifteenth Amendment provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged by ... any state on account of race, color, or previous condition of servitude." *Id.* amend. XV, § 1. As explained in this Opinion, a plaintiff challenging a voting restriction under either amendment must establish that the restriction was motivated, at least in part, by a discriminatory purpose. Accordingly, the Court's discriminatory intent analysis, *see supra* Section IV.A, addresses Plaintiffs' claims under both the Fourteenth and Fifteenth Amendments.

8    Representative David Lewis was Chair of the House Elections Committee in 2013 and Chair of the House Committee on Elections and Ethics Law in 2018. Tim Moore, a primary sponsor of H.B. 589, was Speaker of the House in 2018. And Senator Warren Daniel, a strong supporter of H.B. 589, was a primary sponsor of S.B. 824. (*See* ECF 91-1 at 16.)

9    A North Carolina superior court recently declared that the state's voter-ID amendment was "void *ab initio.*" *See North Carolina State Conference of NAACP v. Moore*, No. 18CVS9806, 2019 WL 2331258, at *6 (N.C. Super. Ct. Feb. 22, 2019). The court reasoned that, in light of the "sweeping racial gerrymander" struck down in *Covington*, "the constitutional amendments placed on the ballot on November 6, 2018 were approved by a General Assembly that did not represent the people of North Carolina" and were, therefore, illegitimate. *See id.* Appeal of that decision is pending. However, for this Court's current purposes, it is sufficient to note that the superior court confined its order to the validity of the voter-ID amendment itself and *not* S.B. 824, which could have been passed absent any constitutional mandate. *See id.* (explaining that "[t]he requirements for amending the state Constitution are unique and distinct from the requirements to enact other legislation").

10    Amendments to the North Carolina constitution are somewhat unusual, but not entirely uncommon. *See* NC Legislative Library, *Amendments to the North Carolina Constitution of 1971*, June 24, 2019, https://www.ncleg.net/library/Documents/NCConstAmendsince1971.pdf.

11    In order to request an absentee ballot, a voter must provide a copy of an "acceptable form[ ] of readable identification that [is] substantially similar" to the types required for in-person voting. *See* 2018 N.C. Sess. Laws 144 § 1.2.(e). A reasonable impediment option is available for absentee voters, as is the case with in-person voting, and the bill expressly states that "lack of access to a method to attach an electronic or physical copy of the [required] identification card" counts as a reasonable impediment. *Id.*

12    The SBOE must approve tribal enrollment IDs issued by tribes recognized by the state under Chapter 71A of the North Carolina General Statutes. 2018 N.C. Sess. Laws 144 § 1.2.(f). Federally recognized tribes are not required to seek SBOE approval. *See id.*

13    Under H.B. 589, as altered by S.L. 2015-103, IDs were accepted as valid if they had been expired for less than four years. *See* 2015 N.C. Sess. Laws 103 § 8.(a).

14  S.B. 824's text does not explicitly state whether a military or veteran ID which *does* contain a printed expiration date would be considered invalid if expired for more than one year.

15  The statute appears to authorize the SBOE to add requirements beyond those listed. *See* 2018 N.C. Sess. Laws 144 § 1.1.(a) ("The State Board shall adopt rules to ensure, at a minimum, but not limited to ...."). However, Defendants confirmed at oral argument that no additional documentation will be required to obtain an ID from a county board in advance the upcoming election cycle. (*See* ECF No. 119 at 137.)

16  Defendants note that "no voter challenges are permitted for reasonable impediment ballots." (ECF No. 97 at 15.) However, it is unclear whether a voter who is successfully challenged for not presenting an acceptable form of photo ID may then proceed to cast a ballot by way of a reasonable impediment declaration and have that ballot counted.

17  The list of acceptable forms of identification under S.B. 824 still pales in comparison to the pre-*Shelby County* version of H.B. 589, which would have permitted voters to use, among others, *any* photo identification issued by federal, state, and local governments—*including public-assistance IDs. See* 2013 H.B. 589 (fifth ed.) § 4; (ECF No. 91-1 at 44–45, tbl. 8).

18  It is also noteworthy that 29% of non-Hispanic African American respondents possessed a public-assistance ID *with a photograph.* (*See* ECF No. 91-1 at 50.)

19  The record before us indicates that the impediments to obtaining no-charge identification may be particularly acute in North Carolina, where many low-income communities lack access to public transportation and where county boards of elections are often many miles from rural voters' homes. (*See, e.g.*, ECF No. 91-12 ¶¶ 6, 16 (describing the barriers to accessing county board of elections offices in Lenoir County and surrounding eastern North Carolina counties).)

20  Defendants' interpretation also appears in tension with S.B. 824 § 1.2.(h), which expressly permits voters to list "not being aware of the requirement" as a reasonable impediment for elections held in 2019, but does not state whether lack of awareness will count as a reasonable impediment thereafter. *See* 2018 N.C. Sess. Laws 144 § 1.2.(h). In the vein of *expressio unius*, the implication is that lack of awareness is *not* a valid impediment moving forward.

21  Professor Lichtman suggests that it is likely that many more people would have lost their vote in a general election, where turnout is typically higher and the average voter is less savvy. (*See id.* at 35.)

22  Under the prior ID law, an RID could be rejected for being "factually false," but also for being "nonsensical" or "merely denigrat[ing]" the identification requirement. *See* 2015 N.C. Sess. Laws 103 § 8.(e).

23  Plaintiffs do not challenge the constitutionality of the voter-ID amendment itself in this lawsuit. However, the Court notes that amendments to state constitutions are not inherently immune from scrutiny under the Fourteenth Amendment. *See e.g., Romer v. Evans*, 517 U.S. 620, 635–36, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996).

24  It should be noted that, in contrast to North Carolina, Virginia has consistently required voters to present some form of identification since 1996. *See Lee*, 843 F.3d at 594. This would diminish any new burden created by Virginia's challenged voter-ID law, as Virginia voters had many years to become accustomed to voting with ID.

25  Section 2 applies to both "vote-dilution" as well as "vote-denial" claims. *See LWV*, 769 F.3d at 239 ("Section 2's plain language makes clear that vote denial is precisely the kind of issue Section 2 was intended to address.").

26  In *Gingles*, the Supreme Court listed a non-comprehensive set of factors to consider: "[1] the history of voting-related discrimination in the State or political subdivision; [2] the extent to which voting in the elections of the State or political subdivision is racially polarized; [3] the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting; [4] the exclusion of members of the minority group from candidate slating processes; [5] the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; [6] the use of overt or subtle racial appeals in political campaigns; and [7] the extent to which members of the minority

group have been elected to public office in the jurisdiction." 478 U.S. at 44–45, 106 S.Ct. 2752. Other relevant considerations which may have probative value include "[8] evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group and [9] that the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous." *Id.* at 45, 106 S.Ct. 2752.

27      Compared to S.B. 824, however, Virginia accepts a much broader array of photographic identification, including: (1) "any ... photo identification issued by the Commonwealth, one of its political subdivisions, or the United States"; (2) any valid photo ID issued by an institute of higher education in Virginia; and (3) "any valid employee identification card containing a photograph of the voter and issued ... in the ordinary course of business." *See* VA Code Ann. § 24.2-643(B).

28      The SBOE has also created posters, to be hung at precincts and early voting sites, which inform voters that they will be "allowed to vote with or without a photo ID card." (ECF No. 97 at 13, 40.)

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.